504 A.2d 247

**Melvin BAKER, Appellant,**

v.

**LAFAYETTE COLLEGE.**

Superior Court of Pennsylvania.

Submitted March 19, 1984.

Filed Jan. 28, 1986.

J. Stephen Kreglow, Easton, for appellant.

George C. Laub and Norman Seidel, Easton, for appellee.

Before SPAETH, President Judge, and ROWLEY and BECK, JJ.

BECK, Judge:

Appellant Melvin Baker ("Baker") was employed by appellee Lafayette College ("the College") as an assistant professor of art under a two-year contract. The College did not reappoint Professor Baker at the end of his two-year term. After Baker's internal appeals proved unsuccessful, he commenced the instant action against the College. His complaint contained three counts: Counts I and II sounded in defamation, and Count III in breach of contract. Baker brings the instant appeal from two orders of the trial court. The first order sustained the College's preliminary objections with respect to parts of counts I and II of the complaint and dismissed the complaint with respect to those parts of Counts I and II. The second order granted the College's motion for summary judgment on all remaining claims. We affirm.

## DEFAMATION

Baker's defamation claims are based on four documents, attached as exhibits to his complaint, containing statements pertaining to Baker's performance as a faculty member at Lafayette College.[1] Exhibit A is a letter written by Professor Joseph Gluhman, then head of the art department, evaluating Baker's performance after the first year of his two-year appointment. Exhibit B is another evaluation of Baker's performance by Professor Gluhman, dated midway through the second year of Baker's contract. Both of these letters are highly critical of Baker's teaching ability, his grading standards, his willingness to contribute to improving the art department and his relationships with other members of the faculty. The second letter (Exhibit B) specifically recommends that Baker not be reappointed.

Exhibit C is a memorandum from Gluhman to Provost George Sause commenting unfavorably on the presence of

---

1. Count I is a libel claim based on the documents themselves and Count II is a slander claim based on the oral repetition of the statements contained in the documents. Our discussion applies equally to both claims.

Baker's wife in his classes. Gluhman concludes the memo by stating that no action should or need be taken because Baker had already been informed that he would not be reappointed.

Finally, Exhibit D is a report written by Dean David Pease of the Tyler School of Art and addressed to Sause. The report states that Pease visited the Lafayette campus on December 20, 1977 at Gluhman's invitation "to discuss the performance of a member of the studio faculty and to review the decision concerning his termination." In the report, Pease indicates his agreement with the decision not to reappoint Baker, and he repeats several of the factual statements about Baker's teaching practices contained in Exhibits A and B, attributing these statements to Gluhman.

■ The trial court dismissed Baker's complaint with respect to Exhibits A and B on the grounds that Baker consented to the publication of these evaluations and that this consent gives the College an absolute privilege. We agree. Section 583 of the Restatement (Second) of Torts (1977) states that "the consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation." Comment (f) elaborates on the meaning of "complete defense," saying

> The privilege conferred by the consent of the person about whom the defamatory matter is published is absolute. The protection given by it is complete, and it is not affected by the ill will or personal hostility of the publisher or by any improper purpose for which he may make the publication.

In *DeLuca v. Reader*, 227 Pa.Super. 392, 323 A.2d 309 (1974), this court cited § 583 in support of its holding that a letter explaining the reasons for disciplinary action against an employee was absolutely privileged where the collective bargaining agreement between the employer and the labor union required the employer to state in writing the reasons for discharge or other disciplinary action. *DeLuca* is commonly cited for the proposition that the public policy embodied in the federal labor laws favoring private resolution of

labor-management disputes requires an absolute privilege to facilitate open and freewheeling debate. *See, e.g., Gordon v. Lancaster Osteopathic Hospital*, 340 Pa.Super. 253, 489 A.2d 1364 (1985) (Cirillo, J. concurring and dissenting); *Agriss v. Roadway Express Inc.*, 334 Pa.Super. 295, 483 A.2d 456 (1984). However, the opinion may also be fairly read as holding that where an employment contract mandates that certain written notices or statements be disseminated to interested persons involved in evaluating an employee's record for the purposes of retention, promotion, discharge or discipline, an employee who is a party to the contract has consented to the publication of such statements, making them absolutely privileged.

▮ We believe that the concept that an employer should not be subject to a defamation suit by an employee based on statements the employer is contractually compelled to make may be extended to employment contracts in non-union contexts as well. In the instant case, Baker argues (in support of his breach of contract claim) that the Faculty Handbook is part of his employment contract. The Handbook provides for annual written evaluations by the department head. Recognizing the implications of this argument, Baker concedes that he consented to be evaluated:

> By signing his employment contract he agreed to the evaluation procedures as set forth in *The Faculty Handbook*. Baker admits *The Faculty Handbook* contained conditions bearing upon his contract with College. Further, it cannot be argued that by accepting those conditions he did not agree to the evaluation process contained therein. Stated simply, Baker consented to be subject to the evaluation process.

Appellant's Brief at 16. As we shall explain in more detail below, we agree that the terms and conditions in the Faculty Handbook were part of the contract between Baker and the College. We therefore hold that Baker consented to the publication of the evaluations which constitute Exhibits A and B.

Baker's position is that any consent he gave to be evaluated does not bar our inquiry into the accuracy and objectivity of the evaluations and the state of mind and degree of care of those responsible for the publications. Baker relies on comment (d) to § 583 of the Restatement, which states that "one who agrees to submit his conduct to investigation knowing that its results will be published, consents to the publication of the *honest findings of the investigators*" (emphasis added). Baker contends that because of Professor Gluhman's bias and irrational behavior, his evaluations were not honest, objective or legitimate and hence should not be privileged.

Baker's argument fails because it is inconsistent with the nature of an *absolute* privilege. In determining the meaning intended by the drafters of § 583 of the Restatement, we should view the commentary with caution, just as we hold that the text of a procedural rule or uniform act controls over the comments thereto to the extent they are inconsistent. *See, e.g., In re Bristol Associates Inc.,* 505 F.2d 1056 (3rd Cir.1974) (comments to Uniform Commercial Code). We therefore decline to apply comment (d) in the manner suggested by Baker because that would have the effect of converting the consent privilege from an absolute privilege to a conditional one.

The courts of our sister states which have applied § 583 have consistently held that consensual publications are absolutely privileged and that the absolute character of the privilege forbids inquiry into ill will, negligence or actual malice (knowledge of or recklessness as to falsity). *Royer v. Steinberg,* 90 Cal.App.3d 490, 153 Cal.Rptr. 499 (1979); *Dominguez v. Babcock,* Colo.App., 696 P.2d 338, 339 (1984), *cert. granted* (Colo. Feb. 4, 1985); *Ernst v. Indiana Bell Telephone Co.,* Ind.App., 475 N.E.2d 351 (1985); *Johnson v. City of Buckner,* 610 S.W.2d 406 (Mo.Ct.App.1980); *Gengler v. Phelps,* 92 N.M. 465, 589 P.2d 1056 (1978). The California court explained this principle succinctly:

Royer also argues that the defense of consent should not be allowed where there is a showing of "reckless dis-

regard for the truth." This is a misunderstanding of the law.... [quoting *comment* (f) to § 583 of the Restatement]. By its very definition, an absolute privilege cannot be overcome by a showing of actual malice; malice is simply not the proper subject of inquiry in such a case.

*Royer v. Steinberg,* 90 Cal.App.3d at 499, 153 Cal.Rptr. at 504.

We also believe as a matter of policy that the consent privilege should be absolute. The person who agrees to submit his work to criticism or evaluation assumes the risk that the criticism may be unfavorable. Therefore when that person consents to a publication of the evaluation he has reason to know that the publication may be defamatory and should not be heard to complain if that is in fact the case. *See* Comment (d) to § 583 of the Restatement.

█ We therefore agree with the well-reasoned decisions of our sister states. The existence of malice, recklessness or negligence does not defeat a privilege based on consent, because such a privilege is absolute. The trial court was correct in holding Exhibits A and B absolutely privileged as a matter of law and dismissing Baker's defamation claims with respect to these documents.

Exhibit C (memorandum from Professor Gluhman to Provost Sause) is likewise a communication concerning Baker's performance. However, it is not one of the formal evaluations provided for in the Faculty Handbook. Therefore this document is not absolutely privileged on consent grounds. In granting the College's motion for summary judgment, the trial court held that Exhibit C was not capable of defamatory meaning and in the alternative that it was conditionally privileged as a matter of law. Although we agree with the trial court on both points, our decision to affirm rests primarily on the lack of defamatory meaning because the defamatory character of the communication is a threshold issue which, if decided against the plaintiff, renders the question of privilege moot.

Whether a publication is capable of defamatory meaning is a question of law for the court to decide. *Doman v. Rosner,* 246 Pa.Super. 616, 371 A.2d 1002 (1977). A publication is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or deter third persons from associating and dealing with him. *Rybas v. Wapner,* 311 Pa.Super. 50, 457 A.2d 108 (1983). Specifically, a communication which "ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession" is defamatory. *Thomas Merton Center v. Rockwell International Corp.,* 497 Pa. 460, 463, 442 A.2d 213, 216 (1981), *cert. denied,* 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351 (1982), quoting Restatement (Second) of Torts § 573 (1977). Even when the record is viewed most favorably to Baker as the non-moving party, which we must do in reviewing the grant of summary judgment, *Ritmanich v. Jonnel Enterprises,* 219 Pa.Super. 198, 280 A.2d 570 (1971), it is clear that Exhibit C is not capable of defamatory meaning. The statement that Baker's wife was present in the classroom when he was teaching does not impugn Baker's talent as an artist, his abilities as a scholar or his skills as a teacher. Professor Gluhman's expression of his disapproval of this practice is a statement of opinion not founded on defamatory facts and therefore not actionable, even if it may be annoying or embarrassing to Baker. *Beckman v. Dunn,* 276 Pa.Super. 527, 419 A.2d 583 (1980).

Exhibit D (report by Dean Pease of the Tyler School of Art to Provost Sause) poses more difficult questions. The College argues that it was consented to by Baker, because the Faculty Handbook provides that "where special competence in judgment is required, the opinion of authoritative persons outside the College may be sought to assist the Faculty Committee on Appointments, Promotions and Dismissals in its evaluation." Baker contends that Dean Pease's report is not protected by the consent privilege for two reasons. First, because Dean Pease's visit to the

College took place after the decision not to reappoint Baker had been made, Baker argues that the report was not published for the use of the College in considering whether to reappoint him. Secondly, Baker maintains he was initially informed that he was not reappointed for economic reasons and on that basis he told Provost Sause he would not appeal the decision on the condition no further evaluations be done. These allegations raise factual issues as to whether Exhibit D is within the scope of the consent Baker gave to be evaluated and whether any consent was revoked by subsequent agreement. Therefore the grant of summary judgment cannot be upheld on these grounds.

However, as with Exhibit C we conclude as a matter of law that Dean Pease's report is not capable of a defamatory meaning. The pertinent portion of Exhibit D is as follows:

*Evaluation of Assistant Professor Mel Baker*

It is my understanding that Professor Baker is currently one of two full-time studio faculty at Lafayette. Because of administrative exigencies it is necessary that one of the two studio faculty positions be eliminated for the coming year. A decision has been made that Professor Baker's position will be eliminated and the other studio faculty member, Ms. Constance Pierce, will be retained. After lengthy discussion with Professor Gluhman and having studied examples of the work produced in Professor Baker's classes, I would concur with the decision which has been made. In any art program and particularly in one the size of the one at Lafayette currently, it is important that each member of the faculty have a commitment to the students and their needs that goes beyond merely meeting the requirements. Students must be exposed to an enthusiastic and solidly prepared faculty who will present them with both challenging and exciting problems. The demands of a small program are different from those in a large department and it takes a very special type of faculty to be able to both enjoy and successfully fulfill the requirements. *Professor Baker seems, from the reports I received, to be less successful*

*at meeting these requirements than the other studio faculty member. His attitude, as reported by Professor Gluhman, would seem to be almost cavalier in his dealings with the students, i.e. no regular office hours, no outside assignments, a general attitute that the best way to build a program is by giving high grades. Although he was brought in originally to develop the sculpture and three-dimensional design program, he does not seem to have any interest in three-dimensional design. His primary interest lies in the area of figurative modeling, but the results of his class, as shown in examples provided for me, seem ordinary at best.*

In fairness to Professor Baker, whom I did not meet, his resume appears to be that of a reasonably active exhibiting artist, and I might speculate that he is more concerned about his own development as an artist than he is in meeting the wide range of needs presented by the students. In a larger department, or in a professional school, this might not be a major problem, since there are usually a far larger number of faculty and the type of role models expected is different; but in a department with only two studio faculty, it is a luxury that cannot be afforded.

If there must be a reduction in the studio staff—and obviously, as an artist and educator, I would like to encourage the college to reinstate the position as soon as it is feasible—it seems that the appropriate decision has been made.

R. 60a–61a (emphasis apparently supplied by Baker).

■■■ The statements of Dean Pease fall into two categories: (1) his opinion that the decision not to reappoint Baker was correct, and (2) the repetition of some of Gluhman's criticisms of Baker. Statements of opinion without more are not actionable, for there can be no such thing as a false opinion in a free society. *Gertz v. Robert Welch Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Braig v. Field Communications*, 310 Pa.Super. 569, 456 A.2d 1366

(1983); *Beckman v. Dunn.* However, a plaintiff may maintain a libel action if he can demonstrate that the statement of opinion "may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." *Beckman,* 276 Pa.Super. at 535, 419 A.2d at 587.

A fair reading of Exhibit D does not lead to the conclusion that Dean Pease's opinions are based on undisclosed defamatory facts. Dean Pease states clearly the reasons underlying his conclusions. He explains that he believes Baker's approach to teaching does not meet the special needs of a small art department and that his subject matter interests do not lie in the areas which the department seeks to develop. Pease also observes that the need to eliminate one of the studio art faculty positions arose because of "administrative exigencies," i.e. economics, and that he [Pease] regrets this need. Finally, Pease suggests that Baker might fit in better at a larger art department or at a professional school. These statements do not reasonably imply that Baker's employment should be terminated because he is an untalented artist or an incompetent teacher. The fact that Baker's teaching methods and interests may not meet the particular needs of a particular institution is not tantamount to a disparagement of Baker's skills which would tend to blacken his reputation.

As for the statements of a factual nature which are contained in the Pease report, we also conclude that they are incapable of a defamatory meaning. In comparison with the highly critical evaluations by Professor Gluhman which we have found to be absolutely privileged, the tone of the Pease report is mild. The report alleges that Baker did not keep regular office hours, did not assign outside work and was an easy grader. While these comments are not exactly laudatory, neither are they of such a nature which would "tend to lower [Baker] in the estimation of the community" in a way that "necessarily involves the idea of disgrace." *Beckman,* 276 Pa.Super. at 533, 419 A.2d at 586. The thrust of the report as a whole is not that Baker is incompetent but that he would be better off in a different

institutional environment. The author of the report does express his support for the decision not to reappoint Baker but he also states his view that it would be better if the College did not need to make staff cutbacks.

In considering the Pease report we note that the nature of the intended audience of a communication is a factor in deciding whether it is capable of a defamatory meaning. *Beckman; see also Rybas v. Wapner,* 311 Pa.Super. 50, 54, 457 A.2d 108, 110 (1983) ("The test is the effect the statement would fairly produce, or the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate") (citation omitted). Although Baker makes the bare allegation that Pease report was disseminated to a variety of persons, including at least one prospective employer, there is in fact no evidence that it was distributed to persons other than College officials involved in the consideration of Baker for reappointment. Baker's bare allegation to the contrary is insufficient to preserve a factual issue for purposes of the summary judgment ruling before us. In *Beckman,* the similarly limited nature of the audience was a substantial factor in the court's decision that the complained-of remarks were not capable of a defamatory meaning. This lends further support to our holding that Exhibit D is not defamatory.

Finally, the statements contained in the Pease report are notably less damaging than other evaluative statements containing more direct imputations of incompetence which the courts have found nondefamatory. *See, e.g., Keddie v. Pennsylvania State University,* 412 F.Supp. 1264 (M.D.Pa. 1976) (decision not to grant tenure to faculty member "was based on evaluation of his effectiveness as a faculty member with teaching, research and other responsibilities on this campus"); *Beckman v. Dunn,* 276 Pa.Super. at 533, 419 A.2d at 586 (doctoral candidate's classwork "quite mediocre" and examination performance "totally inadequate"). *Cf. Avins v. White,* 627 F.2d 637 (3rd Cir.1980), *cert. denied,* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980)

(statement that law school was pervaded by "academic ennui" and lacked "intellectual spark," while possibly critical of dean and disparaging of his performance, held not defamatory).

Under all the circumstances we conclude that the trial court was correct in holding Exhibit D incapable of defamatory meaning as a matter of law. Therefore we uphold the grant of summary judgment on the defamation counts.

## BREACH OF CONTRACT

Baker's breach of contract argument is twofold. First, he contends that he had an enforceable right to renewal of his two-year contract based on oral assurances that he could expect more than two years of employment and on his claim that "the evaluation procedures themselves are geared toward the expectation of renewal." Secondly, Baker argues that the College breached an obligation, embodied in the Faculty Handbook, to evaluate him in good faith on the basis of his teaching record, professional growth and service to the College.

Both of these arguments fail for essentially the same reason—the College at no time assumed any contractual obligation beyond the two-year duration of his appointment. Baker attached as Exhibit E to his complaint the documents which he argues and the College agrees constitute his written contract. Chronologically, the first of these documents is a May 19, 1976 letter offering Baker the position. This letter states clearly that the appointment was for a two-year term and "[a]t this time no assurance can be offered that you will receive a renewal of appointment or that you may be promoted to associate professor or receive tenure." Baker accepted this offer by affixing his signature to a copy of the letter under the statement "I accept the conditions noted above." Exhibit E also contains the College's April 15, 1977 letter to Baker informing of his salary for the second year of his appointment. This letter contains the same "no assurance can be offered" disclaimer

and the identical "I accept the conditions stated above" subscription by Baker.

Baker also contends that the Faculty Handbook is part of the employment contract. The May 19, 1976 letter offering Baker the position states that his employment would be subject to the terms contained in an attached document entitled "General Conditions of Full-time Appointment to the faculty of Lafayette College." This document incorporates by reference the Faculty Handbook's "[s]tatements on factors such as academic freedom, promotion, tenure, retirement, tuition support for children of the Faculty, etc." We therefore agree that the handbook is part of Baker's contract.[2]

Despite this fact, though, we believe the record supports the grant of summary judgment to the College on the breach of contract claim for several reasons. First, nothing in the Faculty Handbook supports Baker's contention that the evaluation procedures were geared to an expectation of renewal. In describing the various ranks within the faculty, the handbook clearly states the customary terms of appointment for junior faculty members and explains that "[a] term appointment for one, two or three years is considered to be terminal with the last year of the term defined in the appointment," with reappointment contingent on recommendation and approval by appropriate departmental and College officials based on a meritorious record of teaching and scholarship (R.431a–432a). This language reinforces rather than contradicts the College's declarations that "no assurance" of reappointment was offered.

Moreover, as a matter of law the oral assurances given to Baker[3] and the handbook's statements on evalua-

---

**2.** The case sub judice is not affected by the Pennsylvania Superior Court's recent en banc decision on the rights of at-will employees, namely, *Banas v. Matthews International Corp.*, 348 Pa.Super. 464, 502 A.2d 637 (1985), because here the written agreement expressly incorporates the Faculty Handbook, and the parties essentially agree that the handbook is part of the contract.

**3.** Whether these oral statements were made is disputed. However, since in reviewing the grant of summary judgment to the College we

tion and reappointment are insufficient to create an enforceable right beyond the stated term. With respect to the oral statements to Baker prior to and contemporaneous with his hiring, they cannot vary the terms of the written contract. This is not a novel rule of law; it is simply an application of the well-known principle that prior or contemporaneous oral representations which concern a subject specifically dealt with in the written contract are not admissible to vary the terms of a written agreement intended by the parties to be the complete contract. *See, e.g., LeDonne v. Kessler,* 256 Pa.Super. 280, 389 A.2d 1123 (1978).[4] Here, Baker indicated in writing his assent to all the terms and conditions contained in a written agreement which, together with the documents incorporated by reference, is a comprehensive statement of the rights and duties of both parties. Among these terms was the statement that the contract was for a two-year term and no assurance of renewal could be offered. The alleged oral representations to the contrary cannot vitiate the parties' written agreement.

With respect to the Faculty Handbook, we have already observed that nothing in the handbook expressly gives Baker the right to reappointment. Indeed, this Court has held that general statements of hiring policy and evaluation procedure incorporated into a non-tenured faculty member's contract do not create a right to continued employment beyond the stated term. In *Krasik v. Duquesne University of the Holy Ghost,* 293 Pa.Super. 165, 437 A.2d 1257 (1981), the plaintiff was employed by Duquesne University as a law librarian with faculty status pursuant to a one-year contract. The university renewed the contract once but denied further renewal at the end of the second year. Plaintiff brought an action seeking to enjoin her termination. She based her claim on certain policies promulgated by the American Association of Law Schools and the Ameri-

must view the record most favorably to Baker, we will take as true Baker's version of the facts.

**4.** This is the principle often referred to as the "parol evidence rule." As we explained in *LeDonne,* this term is a misnomer, for the rule is actually one of substantive contract law.

can Bar Association and incorporated by reference into her contract. These statements of policy concerned the appropriate role of the faculty in personnel decisions. This Court held that such "advisory language" could not overcome the clear statement that the plaintiff's contract was for one year and "[did] not convert the agreement into a contract for permanent employment." Accordingly, we held that the plaintiff was entitled to no relief because her contract had simply expired by its own terms. 293 Pa.Super. at 172, 437 A.2d at 1261.

On the basis of *Krasik* we conclude that the description of evaluation standards and procedures in the Lafayette Faculty Handbook does not overcome the clear statement that the term of Baker's contract was for two years. Although Baker concedes in his brief that "*Krasik* stands for the proposition that a terminal contract creates no right to continued employment" (Appellant's Brief at 30), he contends that is not the essence of his claim. Baker's position is that while he may not have a right to continued employment per se, implicit in his employment contract is an obligation on the College to conduct the evaluation process in good faith. Baker contends that he is entitled to damages because the College breached this obligation.

We hold that the College had a limited duty to evaluate Baker in good faith which is defined by the terms of the College's contractual undertakings. This is consistent with the general duty of contracting parties to perform their contractual obligations in good faith set forth in the Restatement (Second) of Contracts at section 205: "Every contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." The Comments suggest a variety of meanings for "good faith" but perhaps the most perceptive comment is the statement that "its meaning varies somewhat with the context." In the particular context of this case, the College's contract with Baker contained certain undertakings by the College pertaining to the evaluation of faculty members and the faculty member's right to review of unfavorable decisions. The

College was required to render a sincere and substantial performance of these contractual undertakings, complying with the spirit as well as the letter of the contract. In other words, to the extent the College undertook to evaluate Baker, the evaluation and review process must be honest and meaningful, not a sham formality designed to ratify an arbitrary decision already made.

We emphasize that our holding is a narrow one. This case does not present the more difficult issue whether an obligation of good faith and fair dealing should be implied into any employer-employee relationship, including at-will employment. Consequently, we do not decide that issue. We hold only that when an employer such as the College here expressly provides in an employment contract for a comprehensive evaluation and review process, we may look to the employer's good faith to determine whether the employer has in fact performed those contractual obligations. The College's obligation to act in good faith extends only to the performance of those contractual duties it has chosen to assume.

The record admits of no conclusion other than that the College at all times acted in good faith towards Baker. The College complied fully with the evaluation and appeal provisions of the contract,[5] and we find that these procedures were not a sham but guaranteed Baker a fair and meaningful review. Baker had an ample opportunity to present his side of the story to all those involved in the review process,

5. Baker contends that his right to appeal to the Board of Trustees (the final step in the appeal process) was denied because the Board, in denying his appeal, wrote that its committee "has determined not to review Baker's personnel file, or the evaluations contained therein." Baker bases his claim on a letter to him from George Laub, secretary of the Board, stating that the Board would "review the entire record." This letter clearly has no contractual significance; any "promises" therein are without consideration. The Faculty Handbook simply states that a faculty member has the right to appeal to the Board of Trustees; it is silent as to the Board's scope of review. The "record" at that stage of the proceedings consisted of much more than Baker's personnel file; it also would have included the reports of the lower stages of the appeal process. We cannot agree that Baker was denied a meaningful appeal to the Board.

and the record is devoid of any evidence of bias, arbitrariness, misrepresentation or any other sharp practice on the part of the College.

Under the guise of "good faith," Baker would have us conduct a de novo review of the College's decision not to renew his contract. We decline Baker's invitation to reexamine the merits of the College's decision or to apply some sort of negligence standard to the myriad of "sub-decisions" involved, such as how much weight to give certain facts or how much investigation into a particular allegation was warranted,[6] because we hold that the only reasonable construction of the contract between the parties is that at all times the College retained its sole discretion to decide whether to reappoint Baker. The Faculty Handbook states that *"[t]o merit consideration for reappointment,* an Assistant Professor must have a record of good teaching, professional growth, and service to the College." (Emphasis added.) In other words, even if Baker had received the most favorable evaluation possible, he would not be contractually *entitled* to reappointment; he would simply "merit consideration." The College still retained the freedom not to rehire him; Baker had no contractual *right* to reappointment under any circumstances. Therefore, upon finding, as we have, that the College performed all its contractual

6. Baker contends that the officials involved in the appeal process did not investigate certain allegations and that a consultant's report including the consultant's opinion that Professor Gluhman's judgment of junior faculty members was defective was not placed in Baker's file. We note, though, that the record demonstrates that all involved were aware of Baker's version of the disputed allegations through Baker's own words as a result of conversations directly with Baker or memoranda written by Baker for the purpose of stating his side for the record. As for the consultant's report ("the Loerke report"), the record shows that the report was prepared at Provost Sause's request and received in his office (R. 213a). Therefore it is clear that appropriate College officials were aware of the report and its contents, so the technical matter of whether it was formally placed in Baker's file is irrelevant. Viewing the record as a whole there can be no dispute that the persons involved in the evaluation and review process were aware of all relevant information and their good faith cannot be seriously questioned.

obligations fully and in good faith, the terms of the contract require that our inquiry end.

We know of no legal principle which forbids the parties from entering into such a contract and we decline to create one. The evaluation of the performance of a college professor and of his or her suitability to the educational needs, goals and philosophies of a particular institution necessarily involves many subjective, nonquantifiable factors. The assessment of these factors is best performed by those closely involved in the life of the institution, not by judges. It is with good reason that the College retains discretion not to reappoint nontenured faculty members. Even if the faculty member's performance has been exemplary, measured by the most objective yardstick possible, the institution may wish to hire another person because, for example, an individual with superior qualifications has become available, or the institution decides that this particular faculty member does not mesh with the institution's educational goals and philosophies, however excellent his work and distinguished his scholarship. As a matter of sound public policy an institution of higher learning should be free to make such decisions. We believe that engrafting a right to judicial second-guessing of the soundness of personnel decisions made under contracts such as Baker's would hamper this decision-making freedom. It would require courts to inquire into the truth or falsity of matters which are not amenable to such determination, and it would tend to convert an express contract for a specific term into one of indefinite duration, which we have already held in *Krasik* is improper.

We further believe that this holding is not unfair to the employee in this context. Baker was not an at-will employee subject to his employer's whim and caprice. He was protected by an express contract for a specific term. During the term of that contract the College could not dismiss him without cause. When the decision not to reappoint him was made, Baker was entitled to several levels of internal appeals. The College complied fully with Baker's appeal

rights. Baker received the full benefit of his two-year contract. The College's decision not to renew that contract was substantively within its discretion and was made in compliance with the procedures set forth in the contract. Therefore, Baker's contractual claim fails as a matter of law and the trial court correctly entered summary judgment in favor of the College.

Affirmed.

SPAETH, President Judge, files a dissenting opinion.

SPAETH, President Judge, dissenting:

This appeal is from two orders. I believe that both orders should be reversed.

In its first order the trial court sustained the College's preliminary objections in the nature of a demurrer, holding that insofar as the Gluhman evaluations were concerned, appellant had stated no claim against the College for defamation because the evaluations were absolutely privileged. The standard by which we must review a trial court's action sustaining a demurrer is as follows:

> All material facts set forth in the complaint as well as all inferences reasonably deducible therefrom are admitted as true. *Clevenstein v. Rizzuto,* 439 Pa. 397, 266 A.2d 623 (1970). The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. *Hoffman v. Misericordia Hospital of Philadelphia,* 439 Pa. 501, 267 A.2d 867 (1970). Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it. *Birl v. Philadelphia Electric Co.,* 402 Pa. 297, 167 A.2d 472 (1960).

> *Mahoney v. Furches,* 503 Pa. 60, 66, 468 A.2d 458, 461–62 (1983), quoting *Vattimo v. Lower Bucks Hosp., Inc.,* 502 Pa. 241, 465 A.2d 1231 (1983).

Applying this standard, I conclude that it cannot be said "with certainty that no recovery is possible." As I shall try

to show, to hold that the Gluhman evaluations were absolutely privileged is contrary to settled law.

In its second order the trial court granted the College's motion for summary judgment on what was left of the complaint after the preliminary objections had been sustained. The standard by which we must review this order is as follows:

> Summary judgment may properly be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Pa.R.C.P. No. 1035(b); *Toth v. City of Philadelphia*, 213 Pa.Super. 282, 247 A.2d 629 (1968). In addition, we are mindful that in considering a motion for summary judgment the court must examine the record in the light most favorable to the non-moving party; that the court's function is not to decide issues of fact but merely to determine whether any such issues exist; and that all doubts as to the existence of a genuine issue of material fact must be resolved in favor of the non-moving party. *Schacter v. Albert*, 212 Pa.Super. 58, 239 A.2d 841 (1968); *Ritmanich v. Jonnel Enterprises, Inc.*, 219 Pa.Super. 198, 280 A.2d 570 (1971). *Taylor v. Tukanowicz*, 290 Pa.Super. 581, 585, 435 A.2d 181, 183 (1981).

After examining the record in the light most favorable to appellant, I am convinced that, except as to one of his claims for defamation, genuine issues of material fact do exist, and that accordingly, the summary judgment should be vacated and the case remanded for trial, both on appellant's remaining claims for defamation and on his claim for breach of contract.

## The Facts

By letter dated May 19, 1976, the College offered appellant the position of Assistant Professor of Art for a two-

year term, 1976–1978. After stating the term and salary, the letter continued:

> At this time no assurance can be offered that you will receive a renewal of appointment or that you may be promoted to associate professor or receive tenure. Continuation and advancement are dependent upon the staffing situation in your department and your own performance as a teacher, growth in scholarship and contributions to the College community.
>
> The enclosed statement "General Conditions of Full-time Appointment to the Faculty of Lafayette College," dated February 6, 1976, is hereby made a part of this letter and by your acceptance of the appointment becomes part of the agreement between you and the College.
>
> R.R. 64a.

George G. Sause, Provost, signed the letter on behalf of the College. Appellant accepted the College's offer, signifying his acceptance by signing the letter. The "General Conditions" thus made part of appellant's contract of employment state in part: Statements on factors such as academic freedom, promotion, tenure, retirement, tuition support for the children of the Faculty, etc., are to be found in the *Faculty Handbook.*" R.R. 66a. The pertinent provisions of the faculty handbook are as follows:

> 3.32 *Evaluation Procedures*
>
> 3.321 Each nontenured Faculty member is evaluated once a year by his/her Department Head who sends a report of the evaluation to the Provost for the use of the President, the Provost, and the Faculty Committee on Appointments, Promotions and Dismissals.
>
> 3.323 Faculty members are evaluated according to teaching records, professional growth, and service to the College. Evidence of professional growth is normally in the form of, but is not restricted to, books and published articles, papers read at professional meetings, patents granted, and offices held in professional societies.
>
> R.R. 428a.

3.355 A Faculty member who is not reappointed at the end of a stated period, not promoted to tenure status by the expiration of the provisional period, or not promoted to a higher rank after his/her status has been considered by the Appointments, Promotions and Dismissals Committee and who feels there should be review of the matter may take the following steps:

3.3551 The individual may consult with the Provost about the reasons and such factors as may be helpful in furthering his/her career.

3.3552 If the Faculty member after discussion with the Provost feels the decision was made without all available data, he/she may request reconsideration by the Provost and the Appointments, Promotions and Dismissals Committee. The use of such procedure does not preclude the use of the appeal process described in paragraph 3.3553.

3.3553 If the Faculty member feels the judgment is improper on scholarly grounds or unjust for other reasons, appeal may be made to the President. The President will establish an advisory committee of three peers who are of Assistant Professor or higher rank and have had at least two years' service with the College. One member of the committee will be chosen by the Provost, one by the Faculty member, and these two members will select a third member. The committee will review all aspects of the case. It will have access to all the materials that would be available to the Appointments, Promotions and Dismissals Committee, and it may seek the advice of outside consultants. The committee will report its findings to the President who will take such action as he deems appropriate to arrive at a just outcome.

3.3554 If the Faculty member does not accept the decision resulting from the review (3.3553), he/she may appeal to the Board of Trustees by submitting a written appeal to the Secretary of that body.

3.3555 In no case will the appeal process be a cause for extending the term of appointment beyond the established expiration date.

R.R. 433a–34a.

On November 22, 1977, the College's Appointments, Promotions and Dismissals Committee voted not to reappoint appellant for the academic year 1978–1979. R.R. 376a. On December 13, 1977, Provost Sause informed appellant of the committee's decision. According to appellant, Sause explained that his contract was not renewed for economic reasons. R.R. 237a. Sause, however, stated in his deposition that while he mentioned economic reasons in his meeting with appellant, the principal reason for not renewing the contract was that "[appellant] didn't meet what we were looking for for long-term people." Sause Dep. at 20. In addition, Sause said, he was aware that appellant and the head of the Art Department, Professor Joseph Gluhman, did not get along: "I also thought ... that even [sic; given?] the relationship that existed between the two people [it] just wasn't wise to have them both in the same department[;] even the same building." Id. at 19.

Prior to the determination that appellant's contract would not be renewed, Professor Gluhman had prepared two evaluations, dated July 15, 1977, and October 31, 1977, of appellant's performance. R.R. 48a–58a. Appellant was not shown the evaluations, Sause Dep. at 21, which are lengthy and very negative.

In the July 15, 1977, evaluation, in commenting on one of the five courses that appellant taught, Professor Gluhman states: "The approach throughout was unsystematic and unimaginative. The pace was leisurely. Expectations were undefined.... The grading system for the course was confusing and arbitrary to the point of eccentricity. Mr. Baker habitually absented himself from the class for long periods of time." The evaluation further states that appellant "managed [an independent study course] in an irresponsible fashion" and "misunderst[ood] the nature and the seriousness of this advanced instructional option." It also

states that appellant's grading system had been too lenient, since he gave "A"s to 35 of 53 students; that appellant appropriated a classroom to use as an office when he had been assigned an office; and that he played loud music and permitted students to drink beer during class. R.R. 48a–52a. Finally, the evaluation states:

> Mr. Baker ended the year with a flurry of incidents whose climax was a bizarre episode that involved the just retired former head of the Department of Art and Music. . . . Mr. Baker was instrumental in creating this episode, and during its course reportedly indulged in slander, character defamation, and criminal allegations directed against the present head of the Art Department. These included accusations so absurd and demonstrably untrue that they would seem pathetic were they not so calculated and vicious.

R.R. 52a–53a.

In the October 31, 1977, evaluation Professor Gluhman described appellant as resentful, indecisive, overly concerned with winning students' approval, and lacking in "personal commitment or performance as a teacher." R.R. 54a–57a. In recommending that appellant not be rehired Gluhman stated:

> [T]here are clear indications that Mr. Baker's attitudes and methods can lead only to a regression to former conditions in the Art Department. That is, to the beliefs that one need not produce genuinely good results, but only proclaim mediocre or poor work to be good, that the favor of students should be cultivated through low standards and easy grades, that self-interest should take precedence over the demands of a discipline or the best interests of the College, that providing students with happy experiences, informal entertainment and indoctrination in "life styles" should be substituted for proper instruction.

R.R. 54a–55a.

On December 30, 1977, about one week after appellant had been told that he would not be rehired, Professor

Gluhman engaged David Pease, Acting Dean of Tyler School of Art of Temple University, to "discuss the performance of a member of the studio faculty [appellant] and to review the decision concerning his termination." Pease wrote a letter to Provost Sause, dated January 19, 1978, stating his findings. He explained that he had not interviewed appellant but that "[appellant's attitude, as reported by Professor Gluhman, would seem to be almost cavalier in his dealings with the students, *i.e.,* no regular office hours, no outside assignments, a general attitude that the best way to build a program is by giving high grades." R.R. 60a–61a. Appellant was not shown the Pease evaluation. Sause Dep. at 29.

On February 16, 1978, Professor Gluhman wrote a letter to Provost Sause complaining of the "extraordinary, peculiar, and academically deplorable arrangement" of appellant's wife's "habitual[ ]" presence in appellant's classes. R.R. 59a.

In his deposition appellant specifically denied the truth of certain statements contained in Professor Gluhman's evaluations of him, for example, that he had given as many "A"s as Gluhman claimed he had, Baker Dep. at 32; that he refused to use his office and had appropriated a studio instead, *id.* 34; that he had permitted loud music and drinking in his classes, *id.* 36; and that he had slandered Gluhman, *id.* 37. Also in his deposition appellant speculated on the reason for Gluhman's negative evaluations. In May 1977, R.R. 239a, appellant had been asked to meet with the President of the College, K. Roald Bergethon, Provost Sause, and Assistant Provost David Crockett, to discuss Gluhman's behavior. They asked appellant about "Dr. Gluhman's opening private mail of faculty members[;] . . . breaking up of material; Dr. Gluhman's behavior with specific students." Baker Dep. at 49. Appellant said in his deposition that he had been assured that any statements he made would be kept confidential, but he believed that one of the administrators had broken this promise of confidence,

for it was only after the meeting that his relationship with Gluhman began to deteriorate. *Id.* at 50.[1]

When Provost Sause was asked on his deposition about Professor Gluhman's evaluation of appellant, he stated that he had made no effort to verify statements in the evaluation, but that he took the statement Gluhman had made in the first evaluation to the effect that appellant had "indulge[d] in slander, character defamation, and criminal allegations with a grain of salt, frankly." *Id.* at 13–15. Sause further stated, however, that he thought that the evaluation was "fair in terms of the conclusion reached [and he] agree[d] with the recommendation [of non-renewal]." *Id.* at 18.

On March 21, 1978, Professor Gluhman was informed that he had not been granted tenure, and on May 2, 1978, he resigned from the College. Apparently in connection with the decision on Gluhman's tenure, Provost Sause engaged William Loerke of Dumbarton Oaks to conduct an evaluation of "1. Dr. Gluhman's competence in his field; 2. the judgment he exercises regarding performance of teachers of studio and art history; 3. the adequacy of the program he has developed." R.R. 213a. In a lengthy report dated March 23, 1978, Loerke stated his conclusion that "[Gluhman's judgment of the younger faculty is defective, and must be so, granted the serious failure of communication between himself and them." *Id.*

Immediately upon Professor Gluhman's resignation from the College, appellant, by letter dated May 2, 1978, to the President, requested that the appeal procedure provided in the faculty handbook be implemented. In his letter, appel-

---

1. As to whether there was such a breach of confidence, the record is incomplete. The President and Assistant Provost were not deposed. Provost Sause was deposed and denied having told Professor Gluhman what appellant had said about him, except "on one occasion where there was a conflict of reported fact." Sause Dep. at 10. Sause also said, however, that Dr. Robert Stein, the College psychiatrist, was called to speak with appellant concerning Gluhman "to consider whether Gluhman was really letting his temper carry him away and whether he should cool off, calm down." *Id.* at 9. Stein told Sause that in his opinion Gluhman needed counseling. *Id.* at 11.

lant stated: "I believe that the Appointments, Promotions and Dismissals Committee was not informed of all the pertinent facts when my contract was before them for consideration. It is my intention to be certain that certain facts, incidents, confidential conversations and other important data now be presented." R.R. 379a. By letter dated May 5, 1978, the President replied to appellant that an advisory committee would be appointed pursuant to Section 3.355 of the faculty handbook.

The advisory committee appointed by the President was composed of Thomas W. Norton, Assistant Professor of Sociology, Thomas G. Miller, Professor of Chemistry, and Maressa Fanelli, Associate Professor of Languages. The committee met in May 1978 and reviewed appellant's file. The file included the Gluhman evaluations of appellant, the Pease evaluation, and also a memorandum dated May 18, 1978, prepared by appellant at Provost Sause's request. The memorandum stated that before initiating his appeal, appellant told Sause that he believed that "all of the events of the previous Spring were not presented to the [Appointments, Promotions, and Dismissals] Committee," R.R. 243a, and it chronicled the history of the difficulties between appellant and Professor Gluhman. The committee's view of the Gluhman evaluations was as follows:

Professor Norton:

As I read the evaluation of Professor Baker by Professor Gluhman, I felt that Professor Gluhman was not capable of giving a fair and adequate evaluation; and I say that based on the specific points that he raised in his letters of evaluation of Professor Baker, the language of the letters, the innuendo and other indications.

. . . .

It was my judgment that given the language of the evaluations and the matters that he brought out that the [Gluhman] evaluations were not fair evaluations.

Norton Dep. at 15, 22–23.

Professor Miller:

I have a page of notes that's pretty extensive, if I can find it. Here, I commented on Gluhman's evaluation of Baker, that there was a great emphasis on personal things, such as lifestyle and currying favor with students, complaining, Baker's need—or Gluhman stated that Baker had need for constant student approval.

I drew from the tone of these that Gluhman was not capable of making an accurate and unbiased evaluation of Baker on matters such as these.

In Gluhman's evaluation of Baker there are also statements of facts which I thought should be investigated and confirmed or denied that are not matters of opinion or personality, such as comments as to Baker's grading standards, his absence from the first day of classes without notice or permission, his uncooperativeness about budgetary matters, the fact that he spent little time around the department, and missed department meetings, that he absented himself from classes for long periods, studio classes, that he served beer in class, that he helped finish and execute work displayed as students' work, that he failed to maintain office hours, and a couple of other things like that.

I didn't form any opinion about the truth or falsity of any of those statements, but I thought they were worth considering.

Miller Dep. at 34–35.

Professor Fanelli "didn't think that the material presented [to the Appointments, Promotions and Dismissals Committee] was valid," Fanelli Dep. at 48, and that "the evaluation, such as it was, was invalid," *id.* at 46.

Further with regard to Professor Gluhman's evaluation of appellant, Professor Miller stated that the committee did not view its role as one of factfinding but rather of determining whether the process had been fair. *Id.* at 37. Accordingly, the committee did not try to determine whether appellant's or Gluhman's version of certain incidents about which their accounts differed was correct.

With regard to the Pease evaluation, the committee saw no point to it, ordered as it was, following notice to appellant that he would not be rehired. Thus, Professor Norton stated:

> [I]t seemed to me that it was a post facto evaluation of Baker's work, after he had already been formally told that his contract would not be renewed.
>
> That raised in my mind: what was the need for the evaluation of Baker?
>
> Secondly, I was very much bothered by the procedural aspects of the evaluation, more particularly, the fact that, according to the records, Baker's representative work on the part of his students was not evaluated, that Baker was not informed of the evaluation, and that comments about Baker were made by Professor Gluhman. Professor Pease indicates that he did not meet Baker on that occasion.
>
> In short, I thought that the evaluation was flawed.

Norton Dep. at 13–14

And Professor Miller stated:

> Well, I had further ... comments on the Pease evaluation. I had the same lack of confidence in that as the other members of the committee.
>
> It seemed to me that that evaluation was almost a clandestine evaluation that was orchestrated by Gluhman, and the outcome of it was more or less predetermined, and I was struck in that evaluation by the repetition of certain words and phrases that appeared in Gluhman's evaluations earlier.

Miller Dep. at 35–36.

The record is clear that it was the judgment of the advisory committee that appellant had been unfairly treated. Thus, in his deposition Professor Norton repeated the recommendations he had made by letter dated June 5, 1978, to the President, in which he said: "I wish to reaffirm my opinion that Professor Mel Baker of the Art Department was inadequately and unfairly evaluated in the decision involving the non-renewal of his contract." *See* Norton

Dep. at 26; R.R. at 389a. And Professor Fanelli reported to the President that she "felt the evaluation, such as it was, was invalid." Fanelli Dep. at 46. In addition, Norton stated that he had recommended—and he believed that "at least one, if not two other members of the committee" had also recommended—an evaluation by an outside consultant, "because [he] thought that the work of [appellant's] students was improperly evaluated by the Pease evaluation." Norton Dep. at 31. The faculty handbook provides that the Appointments, Promotions and Dismissals Committee "may seek the advice of outside consultants." Faculty Handbook, ¶ 3.3553, *supra.* The President, however, "thought that that was [not] necessary—to do that." Norton Dep. at 32.

On June 7, 1978, the Appointments, Promotions and Dismissals Committee met and discussed "the issues raised in [appellant's] appeal." R.R. 392a. Minutes of the meeting state:

> The President said the advisory committee had concluded that certain aspects of the evaluation process used by the A, P & D Committee should be further reviewed. The President, the Provost, and the Chairman of the A, P & D Committee had agreed that the A, P & D Committee should have an opportunity to read new material presented by [appellant] in a May 18, 1978 memorandum and should be encouraged also to review the letters about [him] composed by Professor Gluhman at the time of the initial appointment (spring 1976) and the evaluation letters submitted in the summer and the fall of 1977.

The committee then voted five to three against recommending appellant's reappointment. Thereafter, the committee unanimously agreed to support the President in any action he took regarding appellant's case. R.R. 392a.

On June 28, 1978, the President wrote to appellant, "respond[ing] formally to [appellant's] appeal letter...." The President's letter states in part:

> [B]ecause of observations made by members of the Advisory Committee, I again reviewed your case with the Committee on Appointments, Promotions, and Dismissals.

I have personally made an intensive study of all materials relevant to your appeal.

All who have reviewed the various documents have agreed that the evaluation.... by Dean Pease of Temple University was methodologically flawed. Therefore, the report will no longer be associated with your personnel records and will be regarded as having no relevance whatsoever to your work at this institution. It must be noted ... that this report was not part of the matter available to and considered by the A, P & D Committee in reaching the conclusion that you have been appealing.... [2]

Serious consideration was given by the Advisory Committee and all others to the statements in your memorandum of May 18 to Provost Sause intended to demonstrate that any report by Dr. Gluhman "directed against me (particularly those dated after May 13, 1977) would be prejudicial in nature and should be highly suspect for evaluative purposes." Your statements must surely have raised some doubts in respect to opinions expressed by the head of your department. However, if your statements are to be taken at face value, fairness would clearly require opportunity for Dr. Gluhman to make comment and perhaps rebuttal.

The letter goes on to point out certain "conflicting interpretations," including discrepancies between appellant's version of certain facts and the President's, and continues:

What you have added to the file as part of the appeal process may, as intended, raise questions about Dr. Gluhman's judgment. The things you report, even if there were no questions of interpretation, do not in themselves or in toto demonstrate that his professional judgment is without validity. Nor does what you have presented add to information about your own performance as a teacher and scholar. The statements you have presented in your

2. The Appointments, Promotions and Dismissals Committee recommended that appellant's contract not be renewed on November 22, 1977. The Pease evaluation is dated January 19, 1978.

behalf also do not alter the institutional circumstances to which the College has responded both in the decision on your further appointment and in defining the personnel level and disciplinary orientation of the department for the period immediately ahead....

I believe I have examined all relevant data available, and I believe I have considered the viewpoints and the factors that are pertinent to your appeal. Having done so, I do not find reason that would justify rejecting and reversing the conclusion of the Committee on Appointment, Promotions and Dismissals in regard to your appointment....

R.R. 398–99a.

On July 3, 1978, appellant appealed to the Board of Trustees, pursuant to Section 3.3554 of the faculty handbook, *supra*. *See* R.R. 401a. The trustees delegated responsibility to consider the appeal to a committee composed of five members of the board. On October 21, 1978, the committee's report recommending that appellant's appeal be denied, was submitted to the board. The board apparently adopted the report the same day.

After summarizing the history of the case, the committee's report to the board stated that on August 1, 1978, the committee met with the Provost, the President, and appellant. (Appellant, it should be noted, still had not seen the Gluhman and Pease evaluations. Sause Dep. at 39.) According to the report, the committee then "considered the material before it [and] evaluated answers to the questions which it had posed during the day.... *Id.* at 140a. The report continued by stating that "[t]he Committee has viewed its function as one of review and to insure that there has been substantive and procedural due process afforded the appellant Baker, that there has been compliance with the applicable rules of the College and that there was substantial evidence upon which the College could have based its decision." R.R. 140a. Following this, the report recited that the committee had made certain "Findings of Fact," among them the following:

2. Baker understood and appreciated that his contract was for a specific period of time and would terminate unless renewed at the close of the academic year 1977–78.

3. Sometime toward the close of the academic year, 1976–77, in May, 1977, Baker said it became apparent to him that there were personality differences with his Department Head. The nature and extent of these differences are not relevant to this committee's determination except to state that Baker was under the impression that he was not looked upon favorably by his Department Head.

4. The Department Head did not give Baker a positive recommendation when the same was requested on October 31, 1977. At about the same time, the College budget was being prepared; and, while budget and fiscal consideration[s] apparently did not enter into the determination not to renew Baker's contract at this time, the Provost was in the process of preparing the budget.

5. The Committee on Appointments, Promotions and Dismissals, made its determination upon the lack of a positive recommendation by the Department Head and recommended non-renewal of Baker's contract.

. . . .

13. The advisory committee consulted with the President and urged another study or independent evaluation of Baker, with the manner of evaluation, to be to judge the quality of teaching by the Art exhibit or the quality of the students['] work. This recommendation was not acceptable to the President and he declined to have a further evaluation.

16. At no time has Baker been impugned, nor have his professional status or qualifications been an issue.

17. Baker was given notice of [and] an opportunity to be heard. His counsel was aware of this opportunity and declined to request opportunity to be heard. Baker was thoughtful in his responses to this committee and the

committee has noted that he had presented himself and his position in a most professional manner.

18. The committee, after considerable discussion, has determined not to review Baker's personnel file, or the evaluations contained therein, and has declined to consider any of the comments or incidents which were raised by Baker in his memoranda regarding his relationship with the Department Head. Taking all of Baker's memoranda submitted for purposes of this appeal and his testimony on August 1, 1978, the committee finds no infringement of free speech, no injury to Baker's personal integrity and no stigma which would preclude Baker's future employment. We further find that there has been previous adequate consideration of all points raised by Baker on his appeal.

R.R. 140–44a.

After stating its findings of fact, the committee made "Conclusions." In the course of doing so, the committee further commented on how it regarded its responsibility:

From a standpoint of college administration and administration of any business, for that matter, the immediate superiors' conclusions are normally entitled to great weight. The committee feels, as the AP & D Committee must have felt, that it is not the province of this committee to supplant the judgment of a Department Head, unless it is alleged that there were illegal or unconstitutional reasons given by the Department Head in his recommendation. There is no such charge nor suggestion in this case. For example, if it were alleged that the Department Head had discriminated against the individual on the basis of one of the constitutional guarantees, e.g., sex, race, religion, country of national origin, age, or deprivation of a property right, then greater inquiry would have to be made. Here it is only suggested that the Department Head and the individual professor did not work well together. Since it is the responsibility of a Department Head to administer his department, and it is unlikely that the recommendation of an immediate superior or Department Head will be disregarded, the AP & D

Committee apparently accepted such recommendation and recommended the non-renewal.

R.R. 145a.

In both the President's letter to appellant, dated June 28, 1978, and the trustees' committee's report to the board, the concern is expressed that appellant did not commence his appeal until some four months from the time he was notified that he would not be reappointed. The record makes clear, however, that appellant did not wish to remain in the Art Department if Professor Gluhman remained, and that he decided to appeal only after it became known that tenure had not been granted to Gluhman. Also, the faculty handbook contains no provision regarding the time for taking an appeal.

When his contract was not renewed, appellant applied for but was denied a position at Temple University. Baker Dep. at 51–52. Appellant stated that the contents of his personnel file, including the Gluhman evaluations, had been communicated in connection with that application. Appellant also stated that while he did not know, he suspected that the contents of the file had been communicated to others. *Id.* at 52. From the time he left the College, in August 1978, until September 1980 appellant was unemployed. In September 1980 he became a visiting artist at Brandeis University, and at the time of his deposition he held that position. *Id.* at 6, 11–12.

### The Defamation Action

The issues presented by appellant's action for defamation are (a) whether the statements about him, in particular, Professor Gluhman's evaluations, were defamatory; (b) if they were, whether their publication was either absolutely or qualifiedly privileged; and (c) if their publication was qualifiedly privileged, whether a jury could find that the College abused the privilege.

### A

Whether a statement is defamatory is for the court. *Beckman v. Dunn*, 276 Pa.Super. 527, 534, 419 A.2d 583, 586 (1980). The test the court must apply is settled:

A libel is "a maliciously written or printed publication which tends to blacken a person's reputation or to expose him to public hatred, contempt, or ridicule, or to injure him in his business or profession." *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 441, 273 A.2d 899, 904 (1971); *Volomino v. Messenger Publishing Co.*, 410 Pa. 611, 613, 189 A.2d 873, 874–75 (1963). A communication is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or deter third persons from associating or dealing with him, *Cosgrove Studio and Camera Shop, Inc. v. Pane,* 408 Pa. 314, 182 A.2d 751 (1962), and necessarily involves the idea of disgrace. *Vitteck v. Washington Broadcasting Co.*, 256 Pa.Super. 427, 389 A.2d 1197 (1978). " 'The test is the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.' " *Corabi v. Curtis Publishing Co., supra* 441 Pa. at 447, 273 A.2d at 907, *quoting, Boyer v. Pitt Publishing Co.*, 324 Pa. 154, 157, 188 A. 203, 204 (1936).

*Id.,* 276 Pa.Superior Ct. at 533–34, 419 A.2d at 586.

By this test, Professor Gluhman's evaluations of appellant were without doubt defamatory, for they attacked appellant in virtually every aspect of his profession: his classroom presentation ("unsystematic and unimaginative"; "absented himself from the class for long periods"); his grading ("confusing and arbitrary to the point of eccentricity"); his supervision of advanced work ("irresponsible"; "misunderstood the nature and seriousness of this advanced instructional option"); and his professional relations ("accusations [against the head of the Art Department] so absurd and demonstrably untrue that they would seem pathetic were they not so calculated and vicious"). Such statements necessarily "tend[ed] to blacken" appellant's reputation, "injure[d] him in his ... profession," "lower[ed] him in the

estimate of the community," and "deter[red] third persons from assisting or dealing with him."[3]

For the same reasons that the Gluhman evaluations were defamatory, so too was the Pease evaluation. In one sense, indeed, the Pease evaluation was more aggravated than the Gluhman evaluations. Since its author, an Acting Dean of another institution, was reporting to Provost Sause as an outside consultant, a degree of impartiality was to be expected; and yet in substance the Gluhman evaluations were accepted, and many of them summarized, without any discussion with appellant.[4] A jury might find that appellant's reputation was more grievously harmed by the purportedly impartial evaluation of an outside consultant than by the Gluhman evaluations. The College, it may be added, was evidently of the same opinion, for as noted, the President wrote appellant that it had been concluded that the Pease evaluation should "no longer be associated with your personnel records" and that it had not been included in the material transmitted to the Appointments, Promotions and Dismissals Committee for its consideration.

3. Professor Gluhman's memorandum regarding the presence of appellant's wife in the classroom does not satisfy this test; it therefore was not defamatory.

4. The trial court states in its opinion that "Dean Pease made many favorable comments about [appellant], and admitted that he did not meet [appellant] before the evaluation." Slip op. of tr. ct. at 7. An examination of the Pease evaluation does not support this characterization. In addition to the excerpts from the evaluation already quoted (regarding appellant's "cavalier" attitude, office hours, and misuse of grades), the evaluation states that although appellant had been "brought in originally to develop the sculpture and three-dimensional design program," he seemed to have no interest in that program, and that in the area that did interest him, "figurative modeling ... the results of his class, as shown in the examples provided for me, seem ordinary at best." Dean Pease further stated that while appellant "appear[ed]" to be "a reasonably active exhibiting artist ... I might speculate that he is more concerned about his own development as an artist than he is in meeting the wide range of needs presented by the students." Finally, Dean Pease stated that he "was very impressed with the dedication and seriousness which Professor Gluhman brings to his job," thereby further putting his imprimatur on Professor Gluhman's evaluation of appellant. Nowhere in the evaluation is there any comment, much less "many comments," "very favorable" to appellant.

B

With the conclusion that the Gluhman and Pease evaluations were defamatory, it becomes necessary to determine whether their publication was privileged. The majority holds that the Gluhman evaluations were absolutely privileged because, it says, appellant "consented to [their] publication." Maj. op. at 74. This conclusion, I submit, is contrary both to the facts stated in appellant's complaint and in his reply to new matter, and to settled law.[5] In my view, the trial court erred in sustaining the College's preliminary objections to the Gluhman evaluations because, accepting as true "all material facts set forth in the complaint," and in appellant's reply to new matter in which he denied that the Gluhman evaluations were absolutely privileged, "the law [*does not*] say[ ] with certainty that no recovery is possible." *Mahoney v. Furches, supra.* My reasons for so concluding shall become apparent shortly. Since the trial court erred in sustaining the preliminary objections, however, and since therefore the Gluhman evaluations should have been considered by the court on the College's motion for summary judgment, I shall consider the Gluhman evaluations with the Pease evaluation, as on motion for summary judgment.

The various absolute privileges that may be asserted in defending against an action for defamation "are based upon policy that treats the ends to be gained by permitting defamatory statements as outweighing the harm that may be done to the reputation." Restatement (Second) of Torts § 584, Title B (1958).

These "absolute privileges" are based chiefly upon a recognition of the necessity that certain persons, because of their special position or status, should be as free as possible from fear that their actions in that position might have an adverse effect upon their own personal interests.

5. The majority holds that the Pease evaluation was not absolutely privileged, but since it concludes that that evaluation was not defamatory, it does not consider the question whether it was qualifiedly privileged. As discussed *infra*, in my view the Gluhman evaluations and the Pease evaluation were qualifiedly privileged.

To accomplish this, it is necessary for them to be protected not only from civil liability but also from the danger of even an unsuccessful civil action. To this end, it is necessary that the propriety of their conduct not be inquired into indirectly by either court or jury in civil proceedings brought against them for misconduct in their position. Therefore the privilege, or immunity, is absolute and the protection that it affords is complete. It is not conditioned upon the honest and reasonable belief that the defamatory matter is true or upon the absence of ill will on the part of the actor.

*Id.*

*See also* Prosser and Keeton, Torts 815 (5th ed. 1984) ("[the absolute privilege] rests upon the ... idea that conduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection, even at the expense of uncompensated harm to the plaintiff's reputation."). Thus, absolute privileges have been created for statements made in legislative proceedings, *see, e.g., Jennings v. Cronin,* 256 Pa.Super. 398, 389 A.2d 1183 (1978), and judicial proceedings, *see, e.g., Binder v. Triangle Publications, Inc.,* 442 Pa. 319, 275 A.2d 53 (1971).

With regard to cases in which the person defamed has consented to publication of the statement, the Restatement provides:

Except as stated in § 584,[6] the consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation.

Restatement (Second) of Torts *supra* § 583.

It is apparent that for Section 583 to be applicable—*i.e.,* before "the consent of another to the publication" may be found—it must appear that the person alleged to have

---

**6.** Section 584 is not applicable here; it provides:

An honest inquiry or investigation by the person defamed to ascertain the existence, source, content of meaning of a defamatory publication is not a defense to an action for its republication by the defamer.

Restatement (Second) of Torts, *supra* § 584.

consented *knew* that the material to be published *might be* defamatory. As the Restatement comment puts the point: "It is not necessary that the other know that the matter to the publication of which he consents is defamatory in character. It is enough that he knows the exact language of the publication or that he has reason to know that it may be defamatory." Restatement (Second) of Torts § 583, comment d. Here, as noted above in stating the facts, appellant, when he initiated his appeal, had not been shown the Gluhman and Pease evaluations, and indeed was not shown them even when he further appealed the President's decision to the board of trustees. Assuming—and the record is unclear on this—that appellant even knew of the *existence* of the evaluations when he initiated his appeal,[7] nothing in the record supports a finding that he had reason to know they might be defamatory. Especially is this so when it is borne in mind that this case arises on appeal from a summary judgment, so that we "must examine the record in the light most favorable" to appellant. *Taylor v. Tukanowicz, supra.*[8]

7. In his deposition Provost Sause stated that appellant had not seen the evaluations that were attached as exhibits to the complaint but that he had discussed them "just generally" with appellant. Sause Dep. at 21. Although the record is not specific as to exactly when appellant saw the evaluations, the inference is that he had not seen them at the time he initiated his appeal, for his May 18, 1978, memorandum to the Provost makes no mention of them. In fact, he states: "I have never been confronted by the administration *or the head of my department* [Professor Gluhman] as to any displeasure with my performance of my teaching, academic or scholarly activities. Just the opposite, I was told that I was doing well." R.R. 243a (emphasis added). As late as August 1978, when he met with the trustees, appellant had not seen the evaluations. Sause Dep. at 36.

8. It may also be noted that while "[a]bsolute privilege in a libel case may be raised by preliminary objections where defendant's privilege appears on the face of the complaint, *DeSantis v. Swigart,* 296 Pa.Super. 283, 287, 442 A.2d 770, 772 (1982), to sustain the College's demurrer as to the Gluhman evaluations, the trial court was required to add to the facts contained in the complaint and to appellant's denial, in reply to new matter, that a privilege applies to this case, the fact that when he was hired by the College, appellant knew or had reason to know that his future evaluations would be defamatory. Not only does no such fact appear in appellant's pleadings, but examina-

In addition to these reasons, there is yet another reason why Section 583 is inapplicable. As comment d points out, "[O]ne who agrees to submit his conduct to investigation knowing that its results will be published, consents to the publication of *the honest findings* of the investigators." Restatement (Second) of Torts § 585, comment d (emphasis added). The essence of appellant's claim is that the Gluhman [and Pease] evaluations, did *not* represent honest findings, and a great deal in the record supports that claim. The College itself acknowledged that the Pease evaluation was "methodologically flawed" and withdrew it from appellant's file. As for the Gluhman evaluations: The College manifested its doubts about Professor Gluhman's reliability by having appellant meet with the President, Provost, and Assistant Provost, to discuss Gluhman's behavior; the College psychiatrist was asked to speak with appellant regarding Gluhman's emotional stability ("whether Gluhman was really letting his temper carry him away and whether he should cool off, calm down"); Provost Sause engaged William Loerke specifically to evaluate Gluhman, including his "competence in his field" and "the judgment he exercises regarding performance of teachers of studio and art history [which would include appellant]"; Sause himself took some of the statements in the Gluhman evaluations "with a grain of salt, frankly"; and Gluhman was not granted tenure. Again, it must be emphasized that the case arises on appeal from a summary judgment. Perhaps at a trial a jury would find that the evaluations were honest. The issue at this point, however, is only whether, after examining the record "in the light most favorable" to appellant, and after resolving all doubts in appellant's favor, we can say that "there is no genuine issue" as to whether the evaluations were honest. *Taylor v. Tukanowicz, supra.* The majority, however, not only fails to acknowledge that this is the standard we must apply, it "declines to apply," Maj. op. at 74, comment d's provision that while one may consent to publication of an evaluation of his conduct, the consent is "to the

tion of the record on the motion for summary judgment strongly suggests that the contrary was the case.

publication of the honest findings of the investigators." The only reason the majority gives for "declin[ing] to apply" comment d is that it is "inconsistent" with Section 583. Maj. op. at 74. I do not understand this. I find no inconsistency. The comment simply recognizes that there are two situations in which one may consent to publication of a defamatory statement: One, where one knows that a statement *exists*, and one has "reason to know that it may be defamatory," the other, where one does *not* know that a statement exists but *does* know that in the course of an investigation of one's conduct it may be made and published, in which case one's consent to publication is consent only to publication of honest findings.

The case law on consent as a defense to defamation confirms this analysis. For the cases show that the basis, or rationale, of the principle that consent to publication of a defamatory statement will preclude recovery for defamation is that one may not, knowing or having reason to know that a statement is defamatory, at the same time consent to the publication and seek damages because of the publication.

This rationale was clearly stated by the Supreme Court of Oregon in *Lee v. Paulsen,* 273 Or. 103, 106, 539 P.2d 1079, 1080–81 (1976):

> *Shinglemeyer v. Wright,* 124 Mich. 230, 82 N.W. 887, 890 (1900), illustrates this rationale. In a private conversation between the parties the defendant charged the plaintiff with stealing his wheel. Plaintiff called a policeman. When he came she told him that the defendant had accused her of stealing his wheel and, in effect, asked him to hear the defendant's version. Defendant told the officer that the plaintiff had stolen his wheel. Plaintiff brought a slander action based upon the defendant's statement to the officer.
>
> The court held for defendant, stating:
>
> > "In regard to the statement by defendant in the presence of the officer Henry, it was not a publication for which the law gives a remedy. She herself solicited

the statement, and sent for the officer for the express purpose of having the defendant repeat the statement in his presence. It would not have been stated to him except by her invitation." *Shinglemeyer v. Wright,* supra [82 N.W.], at p. 890, starting at 3.

The facts in *Lee v. Paulsen, supra,* were as follows. The plaintiff, a teacher, requested a statement of the reasons for his dismissal from employment. At a public hearing on his dismissal, *after* the plaintiff had been furnished with the statement, the plaintiff's counsel requested that the statement be read, and it was that reading that served as the basis of the plaintiff's action for defamation. In holding the statement absolutely privileged, the Supreme Court of Oregon recognized that knowledge that the statement would be defamatory was "essential in order for the publication to be absolutely privileged." *Id.* at 107, 539 P.2d at 1081. The court also stated why, given such knowledge by the plaintiff, publication was absolutely privileged:

> The reason for the imposition of the privilege when the plaintiff consents or requests the publication "is based upon the unwillingness of the courts to let the plaintiff 'lay the foundation of a lawsuit for his own pecuniary gain.'"
>
> *Id.,* 539 P.2d at 1080 (quoting Harper and James, The Law of Torts 400 (1956), and *Richardson v. Gundy,* 88 Kan. 47, 54, 127 P. 533 536 (1912).

*See also Mick v. American Dental Association,* 49 N.J.Super. 262, 275, 139 A.2d 570, 577 (1958) ("It is offensive to an elementary sense of justice that after securing defendant's candid expression of plaintiff's views ... [plaintiff] should be permitted to sue for the injury he thus invited.").

Unlike the plaintiff in *Lee v. Paulsen, supra,* appellant knew neither the contents of the Gluhman and Pease evaluations nor that he would find statements in them defamatory. It may not be said of appellant, as it could be said of the plaintiff in *Lee v. Paulsen,* that he requested publication of the evaluations, knowing they were defamatory, to lay the foundation of a lawsuit against the College. This is

therefore not a case like *Lee v. Paulsen,* in which the absolute privilege of consent was applicable. Neither is this a case in which "the ends to be gained by permitting defamatory statements ... outweigh[ ] the harm that may be done to the reputation." Restatement (Second) of Torts, *supra* § 584, Title B.

The majority relies upon *DeLuca v. Reader,* 227 Pa.Super. 392, 323 A.2d 309 (1974), as support for its conclusion that by consenting to be evaluated, appellant consented to be defamed. *DeLuca* is not in point, as examination of its facts will disclose. *DeLuca's* employer informed him that "he was discharged because of his failure to turn in money collected and his failure to note the cash collection on the company's receipt." *Id.,* 227 Pa.Superior Ct. at 396, 323 A.2d at 311. The next day a manager of the employer wrote DeLuca a letter confirming the dismissal; DeLuca later alleged that this letter contained defamatory statements. Before suing his employer, DeLuca invoked the grievance procedures contained in the collective bargaining agreement of the union of which he was a member, and as a result, his job was reinstated. DeLuca then sued his employer for defamation. In holding that the employer's letter was privileged, we said: "In express furtherance of this policy of private resolution of disputes between employers and employees and unions, the courts have held such remarks are absolutely privileged." *Id.,* 227 Pa.Superior Ct. at 399, 323 A.2d at 313. Initially it should be noted, as the majority acknowledges, that the opinion may be read as applying the privilege solely to remarks made by an employer about a union member for the purpose of fostering private resolution of labor management disputes. The more important point, however, is that an examination of the opinion in *DeLuca* reveals that despite our use of the term "absolutely privileged," we were applying a qualified privilege. Thus we observed that "[t]he letter forming the basis of the action was not unusually published having been sent to the appellee, a vice president of the union, the union business agent and the union shop steward, all persons

having an interest in this proceeding and in accordance with the written contract." *Id.*, 227 Pa.Superior Ct. at 397, 323 A.2d at 312. *See* Restatement (Second) of Torts, *supra* § 596. If we were applying an absolute privilege, these facts would be without significance. Moreover, after concluding that the statements made in the letter were privileged, we went on to decide that there was no evidence of malice. As the majority acknowledges, consideration of malice is irrelevant when an absolute privilege is invoked. Maj. op. at 75 ("The existence of malice, recklessness or negligence does not defeat a privilege based on consent, because such a privilege is absolute."). Finally, even if we had applied an absolute privilege in *DeLuca, DeLuca* is like *Lee v. Paulsen, supra,* for it was with knowledge of the contents of the alleged defamatory letter that DeLuca instituted action under the grievance procedures in his union contract. Here, appellant did not have knowledge of the contents of the alleged defamatory material at the time he exercised his right to appeal under the faculty handbook.

The cases that the majority has cited from other jurisdictions likewise do not support the majority's position.

*Ernst v. Indiana Bell Telephone Co.*, Ind.App., 475 N.E.2d 351 (1985), is like *DeLuca v. Reader, supra.* Ernst was involved in an accident in a company vehicle; his employer claimed that the accident occurred when Ernst was off duty. As a result of injuries sustained in the accident Ernst was unable to work, and for a year he was paid under a company benefit plan. When his employment was terminated, Ernst filed a grievance under the collective bargaining agreement to which he was subject, challenging his employer's conclusion that his injuries had been sustained when he was off duty. The court concluded that the company's statement of its version of the facts was absolutely privileged because when Ernst invoked the provisions of the collective bargaining agreement, he "consented to the publication of the company's version of the matter." *Id.* 475 N.E.2d at 355. Thus, as in *DeLuca v. Reader, supra,*

but not as in this case, when Ernst filed his grievance, he knew what the company's version was.

*Royer v. Steinberg,* 90 Cal.App.3d 490, 153 Cal.Rptr. 499 (1979), and *Johnson v. City of Buckner,* 610 S.W.2d 406 (Mo.App.1980), are absolute privilege cases and also demonstrate the principle of *Lee v. Paulsen, supra.* In each, the plaintiff expressly invited the defamatory comments, with knowledge of their contents, and the court held the statement not to be actionable. In addition it should be noted that while *Royer v. Steinberg* is not in point, another case, decided by the same court but not cited by the majority, is in point. In *Slaughter v. Friedman,* 127 Cal.App.3d 704, 179 Cal.Rptr. 722 (1982), patients of the plaintiff, a dentist, submitted claims to an insurance company. In response to some of the claims the company denied coverage and in its denial notices made statements concerning the plaintiff and his practice that he considered to be defamatory. In holding that the plaintiff had not consented to the publication of the statements, and that the statements were therefore not absolutely privileged, the court stated:

> Defendants contend that the communications involved are not actionable because plaintiff had consented to the publication of the defamation, if any. Unlike *Royer v. Steinberg* (1979)[,] 90 Cal.App.3d 490, 153 Cal.Rptr. 499, on which defendants rely, the plaintiff here had not, himself published the communications herein involved. Plaintiff's consent to have the claims evaluated by defendants did not extend to a consent to the making of the allegedly defamatory communications now before us.

179 Cal.Rptr. at 725.[9]

*Dominquez v. Babcock,* Colo.App., 696 P.2d 338 (1984), *cert. granted* February 4, 1985, must be read as a qualified,

---

**9.** On further appeal, the California Supreme Court considered an issue not considered by the Court of Appeals, the application of Section 592A of the Restatement, which creates an absolute privilege for "[o]ne who is required by law to published defamatory matter...." Supreme Court held that that absolute privilege did not apply. *Slaughter v. Friedman,* 32 Cal.3d 149, 649 P.2d 886, 185 Cal.Rptr. 244 (1982).

not an absolute, privilege case. The issue was whether, when an employee requested "accountability" for alleged defamatory statements made by other faculty members, the employee had consented to their subsequent publication. On motion for summary judgment, the trial court found consent. The court of appeals held that there was a question of fact as to whether the request for accountability amounted to consent. The court of appeals further held, however, that even if there had been no consent, still summary judgment was proper because "plaintiff failed to present any evidence which would sustain a factual finding that defendants had abused their qualified privilege." *Id.* 696 P.2d at 342.

Finally, the majority cites *Gengler v. Phelps*, 92 N.M. 465, 589 P.2d 1056 (1978). There, plaintiff was given three months prior notice of the termination of employment as a nurse anesthetist at a hospital. During that period, in an application for employment at another hospital, the plaintiff stated that references could be sought from her present employer "any time." In response to inquiries, her employer stated that the plaintiff lacked professional competence. The court held that the statement was absolutely privileged. It is not clear from the case report whether the plaintiff knew what kind of recommendation would be given but it does seem clear that the court's holding was based on public policy: "In the business and professional world, public policy necessitates the disclosure of an employee's prior services when inquiry is made with the consent of the employee." *Id.* at 467. 589 P.2d at 1058. This generalization is at best imprecise and should not be taken literally, for to do so would obliterate the distinction between absolute privileges and qualified privileges: an employer may well have a privilege to make statements about an employee's prior services, but this privilege is not absolute; it is qualified, and as such, may be lost if abused.

## C

Without doubt, the College did have a qualified (or, in the Restatement's term, a "conditional") privilege to publish

defamatory evaluations of a member of its faculty: information regarding the competence of the faculty "affect[ed] a sufficiently important interest" of the College, and "the recipient's knowledge of the defamatory matter [was] of service in the lawful protection" of that interest. Restatement (Second) of Torts § 594; *and see Banas v. Matthews International Corp.*, 348 Pa.Super. 464, 502 A.2d 637 (1985). The question to be decided, therefore, is whether the College abused its qualified privilege—more exactly, whether, viewing the record in the light most favorable to appellant, and resolving all doubts in appellant's favor, there is a genuine issue as to whether the College abused its qualified privilege. One who has a qualified privilege abuses the privilege if he knows the matter published to be false, or acts in reckless disregard as to its truth or falsity, or is negligent with regard to the truth or falsity of the matter. *Hepps v. Philadelphia Newspapers, Inc.*, 506 Pa. 304, 485 A.2d 374 (1984), *appeal pending* — U.S. —, 105 S.Ct. 3496, 87 L.Ed.2d 628 (1985); *Banas v. Matthews International Corp., supra; Rutt v. Bethlehems' Globe Publishing Co.*, 335 Pa.Super. 163, 484 A.2d 72 (1984). *And see* Restatement (Second) of Torts § 600 (conditional privilege abused if statement made with knowledge of falsity or with reckless disregard as to its truth.) Applying this test, I find that there is indeed a genuine issue as to whether the College abused its qualified privilege to publish the Gluhman and Pease evaluations of appellant's conduct.

The most obvious instance that a jury might find constituted an abuse of privilege was the College's publication of the Gluhman evaluations to Temple University, when after not being rehired by the College, appellant applied for a position at Temple. As already discussed, the record as it now stands includes ample evidence on the basis of which a jury could find that the College knew or should have known that the Gluhman evaluations were false, and that the College should therefore not have published their contents but should have removed them from appellant's file, as it had removed the Pease evaluation. Of course, at a trial the

jury might find otherwise: given a fuller record, and with the benefit of observing the witnesses, the jury might find, for example, that contrary to appellant's testimony on deposition, the Gluhman evaluations were not published to Temple, or, even if they were, that they were not false. This possibility, however, is of no relevance to disposition of this appeal, arising as it does from summary judgment.

Another, less obvious but by no means obscure, instance that a jury might find constituted an abuse of privilege was Provost Sause's publication of the Gluhman and Pease evaluations to the Appointments, Promotions and Dismissals Committee. The jury might find that Sause knew that Professor Gluhman was emotionally unstable; that Sause further knew, or at least should have surmised, that Gluhman's very negative evaluations of appellant were, or might be, motivated by Gluhman's anger upon learning of appellant's meeting with the President, Sause himself, and the Assistant Provost, at which Gluhman's conduct was discussed; and finally, that Sause made no effort to verify the accuracy of the statements in the Gluhman evaluations, even though he took the allegations (one of the most serious) that appellant had "indulge[d] in slander, character defamation, and criminal allegations with a grain of salt, frankly." On the basis of these findings the jury might further find that Sause either knew that the Gluhman evaluations were false, recklessly disregarded or was negligent as to whether they were true or false, and that therefore, in publishing them to the committee, he abused the College's qualified privilege. The jury might make the same finding with respect to Sause's publication to the committee of the Pease evaluation, since that evaluation not only accepted Professor Gluhman's evaluation of appellant but did so without consulting appellant. The possibility that the jury might make these findings is, moreover, considerably enhanced by the fact that when, in response to appellant's appeal, an advisory committee examined the Gluhman and Pease evaluation, it rejected them both out of hand. As discussed more fully in stating the facts, Profes-

sors Norton and Miller concluded that Professor Gluhman "was not capable" of a fair evaluation of appellant. Professor Fanelli regarded the evaluations as "invalid", and the Pease evaluation was dismissed as "flawed" (Norton), and "clandestine" and "more or less predetermined." If, the jury might well ask, the advisory committee so regarded the Gluhman and Pease evaluations, how was it that Sause had considered them worthy of publication to the Appointments, Promotions and Dismissals Committee?

The order of the trial court should therefore be reversed and the case remanded for trial on the issues whether the Gluhman and Pease evaluations were published (as noted, whether they were defamatory is an issue for the court, not for the jury, and they *were* defamatory); and if they were published, whether they were true, or if not true, whether in publishing them the College abused its qualified privilege to publish them.

### The Contract Action

Appellant argues that the College breached its contract of employment with him in two respects: first, because of verbal assurances given him at the time he was hired, his contract should have been renewed at the end of the two-year term; and second, because the College did not fulfil its obligation to make a fair evaluation of his performance as a member of the faculty. I agree with the majority that appellant's contract was for a two-year term and that there is no merit to appellant's argument that he was entitled to have it renewed. The majority states, however, that both of appellant's "arguments fail [because] the College at no time assumed any contractual obligation beyond the two-year duration of his employment," Maj. op. at 81. This statement betrays a failure to recognize that appellant's second argument is fundamentally different from his first. It is undeniable, and the majority acknowledges, *id.* at 254 n. 2, that the faculty handbook was part of appellant's contract of employment. What the majority's statement fails to recognize is that the principal issue in this case—appellant characterizes it as "the true gist of [his] complaint,"

Brief for Appellant at 26—is, not whether the College had the right to *terminate* appellant's contract at the end of its two-year term, but whether *during that term* the College performed its obligation under the contract to make a fair evaluation of appellant. In my opinion, there is a genuine issue of fact as to whether the College did perform that obligation.

The majority's reliance on *Krasik v. Duquesne University*, 293 Pa.Super. 165, 437 A.2d 1257 (1981), demonstrates its misunderstanding. In *Krasik*, the appellant, the university's law librarian, sought to enjoin the university from terminating her employment at the end of its one-year term. The librarian relied on the fact that her contract had incorporated standards of the American Bar Association and the Association of American Law Schools; in her view, these standards required faculty approval before her employment could terminate, and although the President of the University had written her that her employment would terminate, the faculty had not approved the termination. We concluded, however, that appellant's contract expired by its own terms, and that the standards on which appellant relied were only "vague advisory language" that did not "convert the agreement into a contract for permanent employment . . . nor [did they] require faculty review prior to the expiration of the [one-year] term of the agreement." *Id.*, 293 Pa.Superior Ct. at 172, 437 A.2d at 1261. While *Krasik* supports the majority's dismissal of appellant's first argument, that he had a right to continued employment after his contract expired, it is irrelevant to his second argument, that the College breached its obligation to make a fair evaluation of him.

In considering appellant's second, and principal, argument, it should be noted at the outset that this case differs from many breach of employment contract cases based on an employee handbook. Aside from cases in which an at-will employee has sued for breach of a clause providing for dismissal for just cause only, *see, e.g., Toussaint v. Blue Cross and Blue Shield of Michigan.* 408 Mich. 579, 292

N.W.2d 880 (1980); *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983); *Woolley v. Hoffmann-LaRoche, Inc.*, 99 N.J. 284, 491 A.2d 1257 (1985); *Thompson v. St. Regis Paper Co.*, 102 Wash. 219, 685 P.2d 1081 (1984); *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 443 N.E.2d 441, 457 N.Y.S.2d 193 (1982), many such cases involve a dismissed employee's rights to certain monetary benefits, such as severance pay or vacation pay, *see, e.g., Sweet v. Stormont Vail Regional Medical Center*, 231 Kan. 604, 647 P.2d 1274 (1982); *Langdon v. Saga Corporation*, 569 P.2d 524 (Okla.App.1976). This case is more like cases in which it has been held that an action for breach of contract will lie because the employer did not honor handbook policy regarding demotions, *Salimi v. Farmers Insurance Group*, 684 P.2d 264, 265 (Colo.App.1984), or probationary employees, *Yartzoff v. The Democrat-Herald Publishing Co., Inc.*, 281 Or. 651, 576 P.2d 356 (1978), or grievance procedures, *Carter v. Kaskaskia Community Action Agency*, 24 Ill. App.3d 1056, 322 N.E.2d 574 (1974). Appellant's claim is that because of the negative evaluations that remain in his file, he has been unable to obtain favorable references in connection with his search for a position. If he were able to establish that these negative evaluations are in his file as a result of the College's failure to perform its obligation to make a fair evaluation of him, he would be entitled to damages.

It should further be noted that this is not a case in which we are asked to read into an employment contract an obligation on the part of the employer to dismiss an employee only for good cause. Some courts have found such an obligation. *See, e.g., Gates v. Life Insurance Co.*, 196 Mont. 178, 638 P.2d 1063 (1982); *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974), *modified in Howard v. Dorr Wollen Co.*, 120 N.H. 295, 414 A.2d 1273 (1980); *Cleary v. American Airlines, Inc.*, 111 Cal.App.3d 487, 168 Cal.Rptr. 722 (1980). Others have declined to do so. *See, e.g., Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 652 P.2d 625 (1982); *Brockmeyer v. Dun & Bradstreet*, 113

Wis.2d 561, 335 N.W.2d 834 (1983); *Daniel v. Magma Copper Co.*, 127 Ariz. 320, 620 P.2d 699 (Ct.App.1980). The distinction that must be borne in mind here has been well stated by the Connecticut Supreme Court in *Magnan v. Anaconda Industries, Inc.*, 193 Conn. 558, 479 A.2d 781 (1984). Said the court:

> While we see no reason to exempt employment contracts from the implication of a covenant of good faith and fair dealing in the contractual relationship, we do not believe that this principle should be applied to transform a contract of employment terminable at the will of either party into one terminable only at the will of the employee or for just cause.

*Id.* at 568, 479 A.2d at 787.

While concluding that an employer is bound to exercise good faith in the *performance* of its obligations under an employment contract, the court "decline[d] the invitation of the plaintiff to transform the requirement of good faith into a condition that an employee may be dismissed only for good cause." *Id.* at 571, 479 A.2d at 788.

These distinctions noted, it is in order to consider appellant's claim that the College breached its obligation to make a fair evaluation of him.

If the College was under such an obligation, the obligation was not express but implied; for while the faculty handbook provides for evaluative procedures, it does not expressly state that these procedures must be fairly conducted. Under the Restatement, however, *"[e]very* contract imposes upon each party a duty of good faith and fair dealing in its *performance* and its enforcement." Restatement (Second) of Contracts, § 205 (1979) (emphasis added). *See also* 13 Pa.C.S. § 1203 (Commercial Code: "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement.") Comment a to section 205 of the Restatement provides that "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party. . . ." *And see*

*generally* Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv.L.Rev. 369 (1980)

No Pennsylvania appellate case of which I am aware has explicitly held that the covenant of good faith and fair dealing is to be implied into every contract, although the courts of a majority of jurisdictions have so held. *See* Burton, *supra* at 369, 404 (Appendix). *But see Atlantic Richfield Company v. Razumic,* 480 Pa. 366, 390 A.2d 736 (1978) (duty to terminate franchise agreement in good faith). Nevertheless, without using the terms "good faith" or "fair dealing," it has been held that contracts are to be performed "with faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts, § 205 comment a. For example, in *Philadelphia v. Philadelphia Transportation Company,* 345 Pa. 244, 26 A.2d 909 (1942), it was said:

> "[T]he contract itself must be read in the light of the circumstances under which it was made" and [ ] it is necessary to "consider the situation of the parties at that time, the necessities for which they naturally provided, and the advantages each probably sought to secure and the relation of the properties and rights in regard to which they negotiated."
>
> *Id.,* 345 Pa. at 250, 26 A.2d at 912 quoting *Baseman v. Shell Union Oil Corp.,* 138 Pa.Super. 512, 516, 10 A.2d 881, 883 (1939).

*See also Pritchard v. Wick,* 406 Pa. 598, 178 A.2d 725 (1962). I therefore conclude that the College was under the obligation to make a fair evaluation of appellant's performance as a member of its faculty during his two-year term of employment.

When the record is examined, as we must examine it, in the light most favorable to appellant, all doubts being resolved in appellant's favor, it is evident that a genuine issue of fact exists as to whether the College did make a fair evaluation of appellant. Without repeating the facts

already stated in the opening portion of this opinion, some particularly significant facts may be noted.

To begin, the jury might find, as the faculty advisory committee unanimously found, that Professor Gluhman was unable to make a fair evaluation of appellant, and that the Pease evaluation, conducted as it was "clandestine[ly]" and without consultation with appellant, was at least equally unfair. This finding made, the jury would presumably inquire whether the conduct of the College following the Gluhman and Pease evaluations, in response to appellant's appeal, was consistent with the College's obligation to make a fair evaluation of appellant's performance.

At least one member of the advisory committee, Professor Norton, recommended to the President that a new evaluation be conducted. In his letter to appellant reaffirming the decision not to rehire him, the President, while stating that he had made an extensive review of the file and that he would remove the Pease evaluation, made no mention, either of the advisory committee's conclusion that the Gluhman and Pease evaluations had been unfair, or of the committee's recommendation that another evaluation be conducted. Yet the President's letter reveals that he too had doubts about the fairness of the Gluhman evaluations, for he said: "Your statements must surely have raised some doubts in respect to opinions expressed by the head of your department. However, if your statements are to be taken at face value, fairness would clearly require opportunity for Dr. Gluhman to make comment and perhaps rebuttal." It will be recalled that at the time of the President's letter to appellant, Professor Gluhman had left the College. Even so, if doubts remained about "opinions expressed" by Gluhman, fairness might better have been assured, or so a jury might find, not by opening old wounds by inviting rebuttal by Gluhman, but by engaging an outside consultant to review appellant's performance anew, as Norton had recommended, and as was expressly provided for in the faculty handbook. Faculty Handbook, *supra* § 3.3553.

Provost Sause's deposition reinforces the conclusion that a jury might find that while the College had doubts, at the least, about the fairness of the Gluhman evaluations, it was not prepared to resolve them, choosing instead to leave the evaluations in appellant's file. Certainly Sause did not resolve doubts about the evaluations; he, it will be recalled, made no effort to confirm any of the statements made in them. Nor did the President resolve the doubts, declining, without explanation, the recommendation to engage an outside consultant to make a new evaluation. Given the seriousness of the charges that Professor Gluhman had made, a jury might find that the College, in the exercise of its obligation to make a fair evaluation of appellant, was required to take *some* further action, either to confirm, qualify and explain, or remove the evaluations from appellant's file.

Finally, a jury might find that the conduct of the Board of Trustees provided further support for appellant's position that he was not fairly evaluated. At the time of the trustee committee's report to the board, the decision regarding Professor Gluhman's tenure had been made and the Loerke report, which questioned Gluhman's ability to supervise the members of his department, was in hand. Yet with that knowledge, the committee, while acknowledging that "[T]he Committee on Appointments, Promotions and Dismissals, made its determination [not to rehire appellant] upon the lack of a positive recommendation by the Department Head, [*i.e.*, Professor Gluhman]" stated: "The nature and extent of [the differences between Gluhman and appellant] are not relevant to this committee's determination except to state that Baker was under the impression that he was not looked upon favorably by his department head." It seems apparent, however, and a jury might find, that the differences between the two faculty members were indeed relevant, especially in view of the fact that on the basis of the Loerke report, the trustees had reason to question Gluhman's judgment. In addition, it is clear from the trustee committee's report that the committee considered the College's obligation to appellant as limited to employment for the two-

year contract term, and its obligation on appeal as limited to inquiring, not whether appellant had been fairly evaluated, but only whether he had been afforded "due process." How, a jury might ask, could the trustees say that appellant had been fairly treated, how could they find "no injury to [appellant's] personal integrity," R.R. 144a, and at the same time not even read the evaluations on the basis of which appellant had not been rehired, (much less manifesting any knowledge of the fact that a faculty committee had rejected the evaluations as unfair)? [10]  Was so empty an "appeal" consistent with the College's promise, implicit in its contract with appellant, that appellant's performance as a member of the faculty would be fairly evaluated?

The majority states that "[T]he record admits of no conclusion other than that the College at all times acted in good faith toward [appellant]," and that it "complied fully with the evaluation and appeal provisions of the contract...." Maj. op. at 85 (footnote omitted).  I submit that these statements are not only not supported by but are contrary to the record, and that they represent fact-finding by the majority inconsistent with our obligation to examine the record in the light most favorable to appellant, resolving all doubts in his favor.  The record makes plain what making a fair evaluation of appellant might have entailed: permitting appellant to see the Gluhman evaluations so that he could respond to them; telling appellant that the Gluhman evaluations had been rejected by the faculty advisory committee as unfair, that they were therefore being removed from his file, and that his appeal would be decided without reference to them; appointing an outside evaluator, as recommended by Professor Norton and as provided by the faculty handbook.  None of these actions, however, nor any equivalent action, was taken.  Instead, the Appointments, Promotions, and Dismissals Committee recom-

---

10. Although the trustee committee's report states that the committee "has determined not to review [appellant's] personnel file," it also states that the committee "considered the material before it."  It is not apparent how the committee could "consider[ ] the material" without "review[ing] [appellant's] personnel file," for presumably the file was part of the "material."

mended that appellant not be rehired on the basis of evaluations that the College knew or should have known were unfair; throughout the appeal process appellant was never shown the evaluations; and appellant was never informed, and the record does not suggest, that the decision to deny his appeal was on a basis independent of the evaluations.

The majority further states that "[a]s a matter of sound public policy an institution of higher learning should be free" to decide not to hire a "particular faculty member [who] does not mesh with the institution's goals and philosophies, however excellent his work and distinguished his scholarship." *Id.* at 87. No one could quarrel with this proposition. It is irrelevant, however, to our consideration here, limited as we are—or should be—to deciding whether a jury might find that the College did not honor its obligation to make a fair evaluation of appellant's performance as a member of its faculty during his two-year term, and that as a result, appellant has suffered monetary loss.

Except as to Professor Gluhman's memorandum regarding the presence of appellant's wife in his classroom, the orders of the trial court should be reversed and the case remanded for proceedings consistent with this opinion.

SPAETH, President Judge, wrote this opinion before the expiration of his term on the court.