## Czech v. Gordon

*Barry Penn,* for plaintiff Czech.
*Andrew Allison* for defendants.

COHEN, G.D., *J.,* September 27, 2004—The court has before it the defendants' motion for summary judgment in this lawsuit in which the plaintiff made claims of "malicious defamation" (Count I of the complaint); "slander per se" (Count II); "tortious interference with contract" (Count III); "tortious interference with prospective economic relations" (Count IV); and "commercial disparagement" (Count V).

The court will grant the defendants' motion and dismiss the plaintiff's complaint with prejudice.

## FACTUAL BACKGROUND

The foregoing charges arose from business dealings between the plaintiff and defendants. In 2002, the plaintiff, in addition to his law practice, ran a business called YB Entertainment Group. YB Entertainment Group was devoted to promoting the careers of entertainers. Plaintiff Paul Czech, as the principal in YB Entertainment Group, conducted negotiations with representatives of the defendants, principally defendant Geoffrey Gordon, an employee of Clear Channel Entertainment Inc., for the purpose of placing entertainers in favorable venues. The back story of this lawsuit focused on a group known as the Prophets of the Ghetto. After an initial, successful performance at smaller venues, the Prophets of the Ghetto sought, through YB Entertainment Group, to perform at larger theaters run by the defendants Electric Factory

Concerts Inc. and Clear Channel Entertainment Inc., such as the Electric Factory and the Tweeter Center. On or about September 3, 2002, an exchange of e-mails took place between Elisabeth Colbath, a co-owner of YB Entertainment Group, and Geoffrey Gordon, an official of Electric Factory Concerts Inc., which in turn is a subsidiary of Clear Channel Communications Inc. The e-mail exchange between Ms. Colbath and Mr. Gordon concerned whether the group Ms. Colbath's business represented—Prophets of the Ghetto—could perform on the same show bill as the group Public Enemy, which was to appear at the Electric Factory on September 21, 2002. To capsulize the e-mail exchange, once Ms. Colbath proposed that the Prophets of the Ghetto appear on the September 21 program, Mr. Gordon inquired how many tickets the group could guarantee. Mr. Gordon suggested a guarantee of 500 tickets at $20 a ticket. Ms. Colbath objected to this presumed condition and wrote Mark Schultz, executive director of the Philadelphia Chapter of the National Academy of Recording Arts and Sciences. In her e-mail to Mr. Schultz, Ms. Colbath cited Mr. Gordon's expectation that the Prophets of the Ghetto would sell $10,000 worth of tickets as "a perfect example of how all EFC [Electric Factory Concerts] does is stagnate local artists." To this Mr. Schultz responded with an e-mail defending Electric Factory Concerts. The dialogue between Mr. Gordon and Ms. Colbath deteriorated in tone. Ms. Colbath addressed an e-mail to Mr. Gordon that read as follows:

"We are just going to have to find another way to handle this . . . This looks and sounds like anti-trust to me . . . I am sure our attorney will be interested in this. I

think that a jury will not like your business practices . . . We know who to go to and will be glad to tell them how independent you think you are in a major corporation. This alone may be excellent grounds for an anti-trust suit."

Mr. Gordon responded to Ms. Colbath's message with a note reminding her that she had asked what it would take for the Prophets of the Ghetto to perform in the show. He added:

"IF YOU'RE THREATENING ME AT LEAST HAVE THE GUTS TO DO IT IN PERSON. LOSE MY NUMBERS AND E-MAIL ADDRESS. YOU ARE UNBELIEVABLY UNPROFESSIONAL AND BECAUSE OF THIS BEHAVIOR YOU LEAVE ME NO CHOICE BUT TO NEVER EVER DEAL WITH YOU IN MY LIFETIME. GOOD LUCK. I NEVER SAID NO ONE IS OVER ME. AGAIN, I CHALLENGE YOU TO 'GO OVER MY HEAD.' I WROTE THIS IN CAPITALS SO MAYBE THIS TIME YOU WOULD SEE IT. I HOPE THIS HELPS. . . ."

(The foregoing e-mails are collected in full as exhibits to the plaintiff's third amended complaint—see exhibit B to the defendants' memorandum of law in support of summary judgment.)

At this point, the plaintiff, Paul Czech, got involved in the contretèmps. Geoffrey Gordon called YB Entertainment on the telephone to speak with Ms. Colbath. Mr. Gordon explained the ensuing events as follows:

"I remember calling and asking for Lisa [Ms. Colbath] and Paul [plaintiff] picked up. I said is Lisa there, Paul? He said, Can I put you on the speaker? I said, No, please

don't put me on the speaker. I was put on the speaker and I think it was more of—I don't remember the exact specifics, but it was more of the same tone of threatening lawsuits and so on and so forth . . . ." (See deposition of Geoffrey Scott Gordon, *id.,* exhibit F, p. 161.)

Mr. Gordon denies putting the speakerphone on at his end, but acknowledges that others were within range of his conversation. Mr. Gordon acknowledges becoming "inflamed" (*id.,* p. 165), and, after receiving what he characterized as further threats from Mr. Czech, specifically threats of an anti-trust lawsuit, Mr. Gordon called Mr. Czech a "moron" and "idiot" and "incompetent." (*Id.,* p. 167.)

The parties essentially agree on the central components of the exchange between Mr. Czech and Mr. Gordon other than in one aspect. The plaintiff claims that Mr. Gordon asked to be put on the speakerphone. The defendants deny that Mr. Gordon elected to be on the speakerphone.

The exchange between Mr. Czech and Mr. Gordon is one hemisphere of the plaintiff's lawsuit. The plaintiff also bases his claims of tortious interference with contract and commercial disparagement on the alleged contents of a broadcast on radio station WIOQ on March 22 and 23, 2003. This broadcast read in full:

"Are you a new musician or artist trying to get your big break but you can't seem to get anyone to listen to your stuff? (Phone rings.) Hi, big record label, can I help you? Hi, I'm in a band and I was wondering if you listen (laughing), but we are really good. Yeah kid, that is what they all say. Then, check out the Clear Channel new music network at Q102Philly.com. It is the newest industry hot

spot for up and coming artists to get noticed. Whether it is rock, pop, hip-hop or dance. The Clear Channel new music network is your link to the rest of the world and it is free to join. Post a bio and upload your song for others to check out, get reviews or critique others or maybe you are just a fan of new music and wanna hear what is out there. It is the Clear Channel new music network at Q102Philly.com."

The plaintiff advised the defendants of a witness, one Thomas Keiser, a 19-year-old student at the University of the Arts in Philadelphia and a friend and roommate of plaintiff's photographer. Mr. Keiser said under oath that he heard the foregoing promotion when it aired on both nights and that the words "YB Entertainment" were substituted for the terms "big record label." (Defendants' memorandum of law in support of summary judgment at p. 9.)

Mr. Keiser said that his opinion of Mr. Czech, whom he knew, did not change as a result of hearing the claimed advertisement.

## LEGAL STANDARD

Pennsylvania Rule of Civil Procedure 1035 governs summary judgment and it provides, in relevant part:

"After the relevant pleadings are closed but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law.

"(1) Whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

"(2) If, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury." Pa.R.C.P. 1035.2.

In *Ertel v. Patriot-News Co.,* 544 Pa. 93, 102, 674 A.2d 1038, 1042 (1996), the Supreme Court of Pennsylvania articulated the evidentiary burden a plaintiff must meet in order to defeat a motion for summary judgment in a defamation action as follows:

"We hold that a non-moving party must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor. Failure to adduce this evidence establishes that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law."

Pennsylvania law further requires a plaintiff to satisfy the following elements in order to meet his burden of proving the elements of a defamation case:

(1) The defamatory character of the communication;

(2) Its publication by defendant;

(3) Its application to the defendant;

(4) The understanding by the recipient of its defamatory meaning;

(5) The understanding by the recipient of it as intended to be applied to him;

(6) Special harm resulting to him from its publication; and

(7) Abuse of a conditionally privileged occasion. (See 42 Pa.C.S. §8343(a).)

If plaintiff can adduce sufficient evidence on each of the elements, summary judgment may still be entered against him if defendants can establish the following:

(1) The truth of the defamatory communication;

(2) The privileged character of the occasions on which it was published; and

(3) The character of the subject matter of the defamatory comment as of public concern.

## DISCUSSION

### 1. *Was It Defamatory to Call Mr. Czech an "Idiot," a "Moron," and "Incompetent"?*

The answer to the foregoing question is no. If the answer to the question were yes, then obeisance to the law would require ordinary individuals engaged in commerce, domestic matters, or casual acquaintances to communicate with antiseptic caution or in monkish silence.

The statute requires this court to determine whether Mr. Gordon's communication is capable of a defamatory meaning. See *Maier v. Maretti,* 448 Pa. Super. 276, 671 A.2d 701 (1995). A communication is defamatory if it tends to harm the reputation of another and lower him in the estimation of the community or to deter third persons from associating or dealing with him. *Elia v. Erie Insurance Exchange,* 430 Pa. Super. 384, 634 A.2d 657 (1993). In deciding whether a statement is capable of a defamatory meaning, this court must view the statement in its context and determine whether the statement was

maliciously published and tended to "blacken [the plaintiff's] reputation or to expose him to public hatred, contempt or ridicule, or to injure him and his business or profession." *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 441, 273 A.2d 899, 904 (1971).

A statement which is an expression of opinion is not defamatory. See *Walker v. Grand Central Sanitation Inc.,* 430 Pa. Super. 236, 243, 634 A.2d 237, 240 (1993), and *Baker v. Lafayette College,* 350 Pa. Super. 68, 504 A.2d 247 (1986).

All the plaintiff has shown is that his business associate in a fit of pique called him names. In order for these names to be defamatory under the law, they would have to be directly addressed to Mr. Czech's capacity to carry out his trade or business. For example, had Mr. Gordon approached a judge in the jurisdiction in which Mr. Czech practices as an attorney and expressed an untrue opinion as to Mr. Czech's ability as a lawyer based upon unfounded facts, that would be defamation. Had Mr. Gordon further approached a local popular music figure and told that person untruths or expressed factually unfounded opinions about Mr. Czech's conduct or performance as a popular music entrepreneur, that may be defamation. As it was, Mr. Gordon blew his stack and called Mr. Czech names. While other people may have inadvertently overheard Mr. Gordon, this conduct alone is legally undifferentiated from any common outburst of anger directed by one person to another person.

The plaintiff, in order to meet his burden, would have to show that, in expressing his opinion, Mr. Gordon implied "the existence of undisclosed defamatory facts justifying the opinion." See *Baker v. Lafayette College,* 350

Pa. Super. at 79, 504 A.2d at 252. A loose fusillade of epithets without more merely falls to the ground like an aimless handful of the proverbial sticks and stones.

This court holds that it need not explore the publication of the allegedly defamatory material because it has held that the statements declaimed were not defamatory. However, the plaintiff appears to make the argument that the statements Mr. Gordon uttered were "slander per se" in that they adversely affected him in his lawful trade or business. See *Thomas Merton Center v. Rockwell International Corp.*, 497 Pa. 460, 442 A.2d 213 (1981), *cert. denied*, 457 U.S. 1134 (1982); see also, Restatement (Second) of Torts §573. Under Pennsylvania law, a defendant who publishes a statement which can be considered slander per se is liable for the proven actual harm the publication causes. See *Walker v. Grand Central Sanitation Inc.*, 430 Pa. Super. at 250, 634 A.2d at 244. Viewing the record in the light most favorable to the plaintiff as the non-moving party, and without wavering from its holding that the epithetical statements were not defamatory, this court finds as a fact that the plaintiff has failed to prove any causative link between Mr. Gordon's statements and any damages he may have suffered. Indeed, the plaintiff has placed exhibits in the record showing that, as early as November 14, 2002, he was having difficulty maintaining contractual relations with the Prophets of the Ghetto. (See exhibits W and X to plaintiff's memorandum of law in opposition to defendants' motion for summary judgment.)

Notwithstanding the obviously non-defamatory content of the modest imprecations Mr. Gordon hurled at the plaintiff, the plaintiff mightily seeks to show through

his proof that these words injured his business. For example, exhibit M to the plaintiff's response to the defendants' motion for summary judgment consists of a "Preliminary, initial report and opinion" by one Bernard M. Resnick, Esquire. Mr. Resnick identifies himself in an attached resume as a person active in the entertainment business. (*E.g.,* he has managed the boxer Bernard "The Executioner" Hopkins and several of his clients have won the Billboard No. 1 Award, including Big Pun for "Yeeeah, Baby" and Trina for "Da Daddest Bytch.") Mr. Resnick concludes that since the incident which gave rise to the lawsuit "entertainment attorneys and music industry professionals have refused to sit with or to converse with Mr. Czech at industry events. Entertainment attorneys have revoked their co-counsel arrangements with Mr. Czech's law firm and also have refrained from referring new legal matters to Mr. Czech's law firm. Newspapers which used to regularly and favorably mention Mr. Czech (for example, the *Philadelphia Daily News*) have conspicuously failed to mention him . . . ." Mr. Resnick also highlights in boldface his finding that "Mr. Czech's law firm earned $119,759 less in 2002 than it did in 2001."

This court need not further dissect Mr. Resnick's report and the other proof that the plaintiff offers to show a purported connection between Mr. Gordon's words and his loss of fortune to illustrate that such proof is at best speculative (Mr. Resnick's report is phrased entirely in the subjunctive), and, at worst, far-fetched and self-serving. For example, the year 2002—Mr. Resnick's lodestar year—was almost three-quarters over by the time Mr. Gordon made his remarks. Other than using exemplary figures in the section of his report entitled "Finan-

cial value/loss to plaintiff YB Entertainment Group," Mr. Resnick does not specifically relate any of Mr. Czech's earnings from his law firm in prior years directly to his entertainment management activities. Combined with its overall speculative nature and lack of real hard facts, Mr. Resnick's report veers close to fiction.

Summarizing the court's disposition of the plaintiff's defamation claim, this court has held that the statements made by Mr. Gordon are not defamatory in character and therefore not actionable. Further, they do not blacken the plaintiff's reputation or injure him in his business. See *Green v. Mizner,* 692 A.2d 169, 172 (Pa. Super. 1997); *Baker v. Lafayette College.* To paraphrase Pennsylvania law, the statement was not calculated to produce any deleterious effect in the mind of the ordinary person hearing it and would not naturally engender any harm to the plaintiff's reputation. See also, *Wendler v. DePaul,* 346 Pa. Super. 479, 482, 499 A.2d 1101, 1103 (1985). The statements Mr. Gordon made clearly were not meant in the literal sense nor based on fact, but were no more than vigorous epithets. See *Kryeski v. Schott Glass Technologies Inc.,* 426 Pa. Super. 105, 626 A.2d 595 (1993); and *Parano v. O'Connor,* 433 Pa. Super. 570, 641 A.2d 607 (1994).[1]

Accordingly, judgment will be granted to the defendants on plaintiff's claims of defamation (Count I) and slander per se (Count II).

---

1. See also, Restatement (Second) of Torts §566, specifically comment (c) to section 566 clarifying the distinction between non-actionable pure opinion and potentially actionable mixed opinion.

## 2. *Plaintiff's Remaining Claims—Did Defendants Do Anything to Interfere With His Current or Prospective Contractual Relations?*

A successful cause of action for tortious interference with contractual relations requires the plaintiff to plead and prove: "(1) the existence of a contractual relationship; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of a privilege or justification for such interference; and (4) damages resulting from the defendant's conduct." See *Small v. Juniata College,* 452 Pa. Super. 410, 417, 682 A.2d 350, 354 (1996), *appeal denied,* 547 Pa. 731, 689 A.2d 235 (1997).

Section 767 of the Restatement (Second) of Torts enumerates the factors the court should examine to determine whether the plaintiff has met his proof befitting the allegation of interference with contractual relations:

(a) The nature of actor's conduct,

(b) The actor's motive,

(c) The interest of the other with which the actor's conduct interferes,

(d) The interest sought to be advanced by the actor,

(e) The social interest in protecting the freedom of action of the actor and the contractual interest of the other,

(f) The proximity or remoteness of the actor's conduct to the interference, and

(g) The relations between the parties.

Applying the foregoing matrix to the facts of this case, the court would immediately stress factor (e), "the social interest in protecting the freedom of action of the

actor and the contractual interest of the other." It seems that, in this context, there is a higher social interest attached to protecting the freedom of Mr. Gordon to say whatever he wants harmlessly on the telephone to Mr. Czech so long as Mr. Gordon's words do not disturb any contractual relationship Mr. Czech may at that time have had in place. The plaintiff has made utterly no showing that the conversation between himself and Mr. Gordon undermined any of his existing contractual relations. On the contrary, the defendants have proven and the plaintiff has confirmed that the contracts Mr. Czech had and YB Entertainment had with the Prophets of the Ghetto were faltering at the time Mr. Czech and Mr. Gordon spoke.

Furthermore, there is nothing within Mr. Gordon's remarks specifically directed to any existing contract Mr. Czech may have had with either the Prophets of the Ghetto or any other group or artist. Importantly, Mr. Gordon did not circulate or publish his statements to any third parties who would base contractual judgments upon those words and anything they might imply. The identical reasoning applies to the plaintiff's claim of tortious interference with prospective contract. As the defendant states in his memorandum, it is not sufficient that a plaintiff allege mere hope that a contract will be executed; the plaintiff must establish "a reasonable likelihood or probability that an anticipated business arrangement would have been consummated." *Cloverleaf Development Inc. v. Horizon Financial F.A.,* 347 Pa. Super. 75, 82, 500 A.2d 163, 167 (1985). There is no evidence in this record that Mr. Czech was engaged in any prospective contract or about to negotiate a contract that would have been or

was in any way affected by Mr. Gordon's expressed sentiments. Nor did anything Mr. Gordon say tend to resemble commercial disparagement in that nothing he said was intended to cause pecuniary loss and no pecuniary loss resulted. While there is little law that defines commercial disparagement, what there is requires more proof of actual loss than the plaintiff has mustered.

### 3. *The WIOQ Commercial*

The plaintiff has shown that one individual heard a commercial that may have invoked the name of the plaintiff's business in an arguably disparaging way. While much ambiguity centers upon the existence of the offending words in the commercial, this court, viewing the evidence in the light most favorable to the plaintiff, holds (1) the offending commercial is not defamatory in its content, and (2) that, even had the commercial been aired, its airing had no effect on the plaintiff's business.

The commercial as reported by Mr. Keiser—and corroborated by no other witness—strikes this court as the mere invocation by one business party of another business party's name in a competitive context. This is a quaint and familiar advertising technique, exemplified by certain automobile and beverage concerns who mention their competitors' names in advertisements. Hence, if Mr. Keiser is to be believed—and there is no reason at this juncture not to believe him—the language he heard was fair competitive comment and not defamatory.

Additionally, the plaintiff cannot show that the aired comment caused damage to its business. The most reliable—if the court can call it that—evidence of the

plaintiff's business loss occurs on page 7 of Mr. Resnick's report (see exhibit M to plaintiff's memorandum of law in opposition to defendants' motion for summary judgment) and that assessment only takes the reader up to 2002. The claimed commercial was aired in March of 2003. By February of 2003 the plaintiff was in a contractual dispute with the Prophets of the Ghetto. (See *id.,* exhibits W and X.) What is more, the solitary person who heard or claims to have heard the commercial candidly admits that his opinion of Mr. Czech's reputation did not budge even after hearing the commercial. Thus, the court holds that the WIOQ commercial was not defamatory in any way and caused no damages to the plaintiff under any other count of this complaint and, thus, insofar as the WIOQ commercial relates to any of the other counts, those counts are dismissed pursuant to this court's order granting summary judgment.

### 4. *Other Defendants*

It is the intention of the attached order to grant summary judgment against the plaintiff and on behalf of all defendants to this action. The foregoing reasoning in support of the court's grant of summary judgment applies not only to Mr. Gordon but all the defendants listed in the caption of the complaint.

### CONCLUSION

For the reasons set forth in the foregoing memorandum, this court will grant summary judgment to the defendants on all the counts of the complaint. The plaintiff's complaint will be dismissed. An appropriate order will issue.

## ORDER

And now, September 27, 2004, upon consideration of the defendants' motion for summary judgment, and plaintiff's response thereto, it is hereby ordered and decreed that said motion is granted. It is further ordered that plaintiff's complaint is dismissed.